

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed August 31, 2021**

_____
**United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | JOINTLY ADMINISTERED UNDER |
| CM RESORT, LLC, *et al.*,[1] | § | CASE NO. 18-43168-elm11 |
| | § | |
| Debtors. | § | CHAPTER 11 |
| | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court for determination in this jointly administered bankruptcy case is the *Motion to Compel Trustee to Return Property* (the "**Motion**")[2] filed by the Ruff Management Trust (the "**Trust**"), by and through its three Co-Trustees. Pursuant to the Motion, the Trust requests entry of an order requiring John Dee Spicer (the "**Bankruptcy Trustee**"), the duly appointed trustee of the bankruptcy estates (collectively, the "**Estates**") of the chapter 11 debtor CM Resort, LLC ("**CM Resort**") and its debtor affiliates listed in footnote 1 below (collectively, the

---

[1] The jointly administered debtors in this case are CM Resort, LLC; CM Resort Management, LLC; Destination Development Community III, Ltd.; Destination Development Partners, Inc.; Specfac Group, LLC; Sundance Lodge, LLC; Sundance Residence Club, LLC; Sundance Partners, LLC; Sundance Residences, LLC; and Icarus Investments, Inc.

[2] Docket No. 421.

"**Debtors**"), to return $420,000 of alleged Trust funds to the Trust that the Co-Trustees of the Trust assert Suzann Ruff ("**Suzann**"), the primary beneficiary of the Trust, impermissibly arranged to have transferred to the Bankruptcy Trustee for use in administering the Estates.

Suzann has filed a response in opposition to the Motion ("**Suzann's Response**"),[3] to which the Trust has filed a reply (the "**Reply**").[4] The Bankruptcy Trustee has separately also filed a response to the Motion (the "**Bankruptcy Trustee's Response**").[5] On June 1, 2 and 4, 2021, the Court conducted an evidentiary hearing on the Motion.

Having now considered the Motion, Suzann's Response, the Bankruptcy Trustee's Response, the Reply, the admitted evidence,[6] and the arguments of counsel, for the reasons set forth herein the Court will grant the Motion in part, and deny the Motion in part, as more fully set forth below.

### *JURISDICTION*

The Court has jurisdiction of this proceeding pursuant to 28 U.S.C. §§ 1334 and 157 and *Miscellaneous Order No. 33: Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* (N.D. Tex. Aug. 3, 1984). Venue of the proceeding in the Northern District of Texas is proper under 28 U.S.C. § 1409. The proceeding is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A).

---

[3] Docket No. 425.

[4] Docket No. 428.

[5] Docket No. 434.

[6] Exhibits of the Trust are referred to as "Tr. Exh. ___"; exhibits of Suzann are referred to as "Suzann Exh. ___"; and exhibits of the Bankruptcy Trustee are referred to as "Bankr. Tee Exh. ___".

## *FACTUAL BACKGROUND*

**A.**     *Establishment of the Ruff Management Trust and Its Key Terms*

Suzann is the widow of Arthur Ruff ("**Arthur**"). Arthur had been an extremely successful businessman and Suzann and Arthur amassed a considerable amount of wealth during the time of their marriage. Among the assets allegedly owned by Suzann following Arthur's death in 1998 was approximately 4,000 acres of real property located in Palo Pinto County, Texas (the "**Palo Pinto Property**"), including certain ranch property commonly referred to as the 7-R Ranch.[7]

Following Arthur's death, Suzann turned to one of her sons, Michael Arthur Ruff ("**Michael**"), to help manage her financial affairs. Among other things, in 2007 Suzann was advised to set up a trust to hold her assets. She agreed to do so and on or about July 26, 2007, Suzann (as the Settlor) and Michael (as the initial Trustee)[8] executed an agreement to establish the Trust. On September 11, 2008, they executed an amended and restated Trust Agreement, effective July 26, 2007 (the "**Trust Agreement**").[9] Suzann transferred all, or substantially all, of her assets to the Trust.

Under the terms of the Trust Agreement, "[a]ll of the trust estate is and shall in the future constitute Settlor's [*i.e.*, Suzann's] separate property and estate." Trust Agreement § 2.2. Correspondingly, Suzann is designated as the sole beneficiary of the Trust during her lifetime with her children, Michael, Matthew David Ruff, Tracy Ruff Bakshi ("**Tracy**"), Kelly Ruff Frazier

---

[7] *See* Adversary No. 18-04147, Docket No. 5-9, at pp.208-24 (Fourth Amended Petition filed by Suzann in the Fraud Lawsuit (as defined below), ¶ 31). The Court takes judicial notice of such Petition for the limited purpose of noting the allegations made therein and the nature of the action pursued.

[8] For the avoidance of confusion, all references hereinafter to the "Trustee" shall be in reference to the trustee of the Trust and *not* to the Bankruptcy Trustee.

[9] *See* Tr. Exh. A-1 (Trust Agreement).

("**Kelly**") and Mark Ryan Ruff ("**Mark**") designated as residual beneficiaries upon her death. *See* Trust Agreement §§ 3.1A, 3.2 and 4.1.

The Trust Agreement provides for the Trust to be administered by the Trustee. Under the terms of the Trust Agreement, "the Trustee shall hold, administer, and distribute the trust estate in accordance with the terms of [the Trust Agreement]." Trust Agreement § 2.2. Section 3.1A of the Trust Agreement more specifically provides that, during Suzann's lifetime, "[t]he Trustee shall distribute to the Settlor [*i.e.*, Suzann] so much of the net income and principal of the trust estate as the Trustee determines for Settlor's Needs or Best Interests." Trust Agreement § 3.1A. The Trust Agreement goes on to provide that "[d]istributions for the 'Needs' of a beneficiary shall mean so much of the trust estate as will provide for that beneficiary's health, support, maintenance, and education in [her] accustomed manner of living … limited to the ascertainable standard within the meaning of Sections 2514(c)(1) and 2041(b)(1)(A) of the [Internal Revenue] Code." Trust Agreement § 5.2A. And the Trust Agreement provides that "[d]istributions for the 'Best Interests' of a beneficiary shall mean so much of the trust estate as the Trustee deems advisable without regard to any defined distribution standard." Trust Agreement § 5.2B.

As indicated above, Michael was designated to serve as the initial Trustee.[10] At any time thereafter, Suzann and Michael could jointly appoint a successor Trustee or one or more Co-Trustees. *See* Trust Agreement § 6.2A. The Trust Agreement further provided that should Michael cease to act as the Trustee and Suzann and Michael fail to appoint a successor Trustee upon the death, removal or resignation of the sole remaining Trustee, then Tracy, Kelly and Mark (collectively, the "**Ruff Children**") would automatically be appointed as successor Co-Trustees. *See* Trust Agreement § 6.2B.

---

[10] *See also* Trust Agreement § 6.1.

**B.** *Trust Administration Disputes Arise, Frost Bank is Appointed as Successor Trustee, and Suzann Commences the Fiduciary Lawsuit*

According to the Ruff Children, within a couple years of establishment of the Trust, disputes began to arise between Suzann and Michael with respect to Michael's administration of the Trust.[11] Ultimately, in partial resolution of the dispute, Michael resigned as Trustee and Frost Bank ("**Frost**") was appointed to serve as the sole successor Trustee, effective March 1, 2010.[12] In connection with the resolution, certain instruments were executed to acknowledge the validity of the Frost appointment and to release Frost from liability (collectively, the "**Frost Agreements**").[13]

In 2011, Suzann initiated litigation in the Probate Court of Dallas County, Texas (the "**Probate Court**"), Cause No. PR-11-02825-1 (the "**Fiduciary Lawsuit**"), to pursue claims of breach of fiduciary duty and fraud against Michael in relation to his prior administration of the Trust. Thereafter, relying upon an arbitration provision of the Frost Agreements, Michael pressed for arbitration of the dispute,[14] filing a Demand for Arbitration against Suzann with the American Arbitration Association ("**AAA**"), Case No. 71-20-1200-0640 (the "**Arbitration**"),[15] and a motion to compel arbitration in the Fiduciary Lawsuit.[16] Granting the motion, the Probate Court ordered the parties to arbitrate the dispute and stayed the litigation pending the outcome of arbitration. Suzann then filed a counterclaim in the Arbitration to assert the same breach of fiduciary duty and fraud claims against Michael as had been asserted in the Fiduciary Lawsuit.[17]

---

[11] *See* Suzann Exh. 8, at p.13.

[12] *See id.*, at pp.13-14; Tr. Exh. R, at p.1.

[13] *See generally* Suzann Exh. 8, at p.14.

[14] *See id.*, at p.14.

[15] *See* Tr. Exh. Z-1 (attached Final Award in the Arbitration, ¶ 1).

[16] *See* Tr. Exh. Z-1, at p.1.

[17] *See* Tr. Exh. Z-1 (attached Final Award in the Arbitration, ¶ 2).

### C.     *Frost Initiates the Trust Action and Suzann Initiates the Fraud Lawsuit*

During the pendency of the Arbitration, two additional actions were commenced.  First, as a result of the assertion of one or more claims in the Arbitration against Frost in its capacity as the new Trustee of the Trust,[18] Frost initiated a separate action in the Probate Court in 2014, *In the Matter of the Ruff Management Trust*, Cause No. PR-14-03113-1 (the "**Trust Action**"), to seek declaratory relief and instructions with respect to administration of the Trust.[19]

Separately, in 2014 Suzann initiated litigation in the 29th District Court of Palo Pinto County, Texas, Cause No. C46164 (the "**Fraud Lawsuit**"), against certain entities alleged to be associated with Michael to pursue the recovery of the Palo Pinto Property, which Suzann asserted that Michael and such entities had fraudulently misappropriated and transferred away from Suzann.[20]

### D.     *The Arbitration Award is Issued and the Final Judgment is Entered*

On December 7, 2017, the three-member AAA arbitration panel issued a Final Award in the Arbitration (the "**Arbitration Award**") pursuant to which the panel awarded Suzann $49 million in actual damages, greater than $3.9 million in attorneys' fees and expenses, and approximately $12.8 million in prejudgment interest against Michael.[21]  Additionally, the panel determined and declared that "[a] constructive trust exists and is imposed in favor of Suzann Ruff on [1] Michael Ruff's interests, of whatever nature, in any entity which he formed or invested, in whole or in part with monies or property misappropriated from, and originating with Suzann Ruff

---

[18] *See* generally Tr. Exh. Z-1 (attached Final Award in the Arbitration, caption and p.5 (¶ D)).

[19] *See* Petition filed by Frost in the Trust Action on September 5, 2014.  The Court takes judicial notice of such Petition for the limited purpose of noting the allegations made therein and the nature of the action pursued.

[20] *See* Adversary No. 18-04147, Docket No. 5-1, at pp.1-33 (Original Petition filed by Suzann in the Fraud Lawsuit).  The Court takes judicial notice of such Petition for the limited purpose of noting the allegations made therein and the nature of the action pursued.

[21] *See* Tr. Exh. Z-1 (attached Arbitration Award, at pp.5-6 (¶¶ A, B and E)).

in all capacities, which the Panel finds includes, but is not limited to, any interest of whatever nature Michael has in the entities listed on Exhibit 'A' attached [to the Arbitration Award (the "**Entity and Property Listing**")] … [and] [2] any real property belonging to or originating from property belonging to Suzann Ruff, in all her capacities, and held or owned, in whole or in part, by Michael Ruff, in any capacity, relating in any way to the so-called Palo Pinto County, Texas, properties, specifically including, but not limited to those properties identified in subsections hhhhhh through kkkkkk on [the Entity and Property Listing]."[22]

Armed with the Arbitration Award, Suzann returned to the Fiduciary Lawsuit to request the Probate Court's entry of a final judgment consistent therewith. On April 10, 2018, the Probate Court entered a Modified and Corrected Final Judgment (the "**Final Judgment**") incorporating the terms of the Arbitration Award.[23] Michael then initiated an appeal to the Court of Appeals for the Fifth District of Texas at Dallas (the "**Dallas Court of Appeals**").

### E. The Bankruptcy Cases are Filed and the Fraud Lawsuit is Removed

Among the entities listed on the Entity and Property Listing of the Arbitration Award are all of the Debtors with the exception of CM Resort.[24] And among the properties listed on the Entity and Property Listing are certain "real property assets" aggregating roughly 4,700 acres of real property located in Palo Pinto County, Texas.[25] Despite the fact that the Entity and Property Listing is less than descript in referring to the "real property assets," with the Final Judgment in hand Suzann sought to advance her claims in the Fraud Lawsuit.

---

[22] *See* Arbitration Award, at p.6 (¶¶ F and G and attached Entity and Property Listing).

[23] *See* Tr. Exh. Z-1 (Final Judgment).

[24] *See* Entity and Property Listing, at pp.1-2 (¶¶ q, v, w, pp, ooo, qqq, rrr, sss and ttt).

[25] *See id.*, at p.4 (¶¶ hhhhh – kkkkkk).

On August 15, 2018, however, CM Resort filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code and immediately removed the Fraud Lawsuit to this Court, thereby initiating Adversary No. 18-04147 (the "**Fraud Adversary**").[26] The Fraud Adversary remains pending to this day.[27]

Thereafter, each of the other Debtors filed its own voluntary petition for relief under chapter 11 of the Bankruptcy Code and, on November 15, 2018, the Court entered an order providing for the joint administration of the Debtors' bankruptcy cases under the CM Resort case number. Among the properties scheduled as owned by the Debtors CM Resort, Specfac Group, LLC and Sundance Lodge, LLC are several tracts of real property located in Palo Pinto County, Texas, including certain properties described as being within a phase of the 7-R Ranch (collectively, the "**Scheduled Real Property**").[28]

Following the bankruptcy filings and removal of the Fraud Lawsuit, Suzann filed a motion for the appointment of a chapter 11 trustee of the Debtors' Estates based upon, among other things, the fraud and breach of fiduciary liability adjudicated under the Arbitration Award/Final Judgment and Michael's alleged direct or indirect control of each of the Debtors.[29] On December 27, 2018, the Court rendered a decision on the motion, granting the motion and ordering the appointment of

---

[26] By the date of the bankruptcy filing and removal, each of the Debtors was a named defendant to the Fraud Lawsuit. *See* Adversary No. 18-04147, Docket No. 5-9, at pp.208-24 (Fourth Amended Petition).

[27] All claims asserted by/against Suzann against/by the non-debtor defendants, however, were remanded to the 29th District Court of Palo Pinto County, Texas by order entered in the Fraud Adversary on October 3, 2018. *See* Adversary No. 18-01417, Docket No. 41.

[28] *See* Case No. 18-43168, Docket No. 13 (Schedule A/B, response to Question 55); Case No. 18-43561, Docket No. 22 (Schedule A/B, response to Question 55); Case No. 18-43168, Docket No. 13 (Schedule A/B, response to Question 55).

[29] *See* Docket No. 22.

a chapter 11 trustee of the Debtors' Estates.[30]  The Bankruptcy Trustee was then appointed to serve as the chapter 11 trustee.[31]

From day one of the Bankruptcy Trustee's appointment, Suzann has taken the position that "she is in fact the equitable owner of [CM Resort] and its assets by virtue of the [Final Judgment]."[32]  She has taken a similar stance in relation to Debtors Specfac Group, LLC and Sundance Lodge, LLC and their assets.[33]  Given Suzann's position (which, to date, the Bankruptcy Trustee has not conceded) and its implications to administration of the Estates, the Bankruptcy Trustee and Suzann have largely and informally agreed to maintain the bankruptcy case and Fraud Adversary in a holding pattern pending final resolution of all appeals from the Final Judgment.

## F.      Frost Resigns and the Ruff Children are Automatically Appointed as Successor Co-Trustees

Meanwhile, on April 29, 2019, Frost provided notice in accordance with applicable terms of the Trust Agreement of its intent to resign as Trustee of the Trust, effective May 30, 2019.[34] Faced with the impending resignation, Suzann and Michael had the right under the Trust Agreement to replace Frost with a successor Trustee or Co-Trustees mutually agreed upon by them.  See Trust Agreement § 6.2A.  In the absence of such action by the effective date of Frost's resignation, however, Frost would automatically be replaced by the Ruff Children as Co-Trustees of the Trust.  See Trust Agreement § 6.2B.

---

[30] See Docket Nos. 41 (order) and 50 (transcript of ruling).

[31] See Docket Nos. 42 and 45.

[32] Docket No. 22 (Suzann's motion for the appointment of chapter 11 trustee, ¶ 11).

[33] See generally Adversary No. 18-04147, Docket No. 5-9, at pp.208-24 (live Fourth Amended Petition in the Fraud Adversary).

[34] See Tr. Exh. R, at p.9.

Given the litigation that had taken place with Michael and, at one point, the Ruff Children as well, neither of those options was acceptable to Suzann. Consequently, Suzann opted to return to the Trust Action and file a motion on May 14, 2019, to request the Probate Court's entry of an order modifying the Trust Agreement to enable her, alone, to appoint either herself or some other third party to serve as the successor Trustee in place of Frost subject to Probate Court approval (the "**Trust Modification Motion**").[35]

As of May 30, 2019, the effective date of Frost's resignation, the Probate Court had not yet ruled on the Trust Modification Motion. Consequently, because Suzann and Michael had also failed to agree upon a successor Trustee, the Ruff Children were automatically appointed as Co-Trustees of the Trust under the terms of the Trust Agreement.[36]

### G.     The Trust Modification Motion is Granted; Suzann Offers Financial Assistance to the Bankruptcy Trustee in Maintaining the Scheduled Real Property

On December 3, 2019, the Court conducted a status conference in the Fraud Adversary. At that time, while Suzann's counsel continued to suggest that the Fraud Adversary be held in check pending resolution of the appeal of the Final Judgment, the Bankruptcy Trustee's counsel reported to the Court that the Bankruptcy Trustee had concern about the ongoing delay because the Estates did not have sufficient liquidity to, among other things, maintain insurance coverage for the Scheduled Real Property. Moreover, because of the nature of the Final Judgment – in particular, the constructive trust provisions of the Final Judgment – and the nature of the pending claims in the Fraud Adversary, the Bankruptcy Trustee expressed reservation about the ability to obtain secured financing and/or to sell certain of the Scheduled Real Property to fund such insurance

---

[35] *See* Suzann Exh. 4 (Exh. 1 thereto).

[36] *See also* Tr. Exh. R.

expenses. Hearing the report, the Court cautioned the parties that the failure to maintain insurance coverage on property of the estate is a basis for dismissal of the bankruptcy case.

As chance would have it, that same day, December 3, 2019, the Probate Court signed an order granting the Trust Modification Motion, thereby modifying the Trust Agreement to enable Suzann to unilaterally appoint herself or any other third party as a Trustee or Co-Trustee of the Trust *subject to court approval* (the "**Trust Modification Order**").[37] The Ruff Children initiated an immediate appeal to the Dallas Court of Appeals and filed an emergency motion to stay the order pending appeal. The Dallas Court of Appeals denied the stay request.[38]

Thereafter, apparently concluding that the Trust Modification Order not only modified the Trust Agreement but also authorized Suzann to immediately appoint herself as the sole successor Trustee to Frost, Suzann purported to appoint herself as the sole successor Trustee on December 4, 2019.[39] Significantly, at no point did the Probate Court enter a separate order(s) (a) approving Suzann's appointment of herself as a/the Trustee, or (b) removing the Ruff Children as Co-Trustees, a point that would later be emphasized by the Dallas Court of Appeals.[40] Nevertheless, based upon Suzann's assertion that she was the authorized sole successor Trustee, Frost delivered or otherwise transferred all of the Trust assets to Suzann's control.

Then, on or about December 30, 2019, Suzann unilaterally and without any consultation with or the agreement of any of the Ruff Children arranged to have $70,000 in Trust funds transferred from the Trust's account at Edward Jones to the Bankruptcy Trustee for use in, among

---

[37] *See* Suzann Exh. 4 (Exh. 1 thereto).

[38] *See id.* (Exh. 9 thereto).

[39] *See* Suzann's Response, ¶ 43.

[40] *See* Tr. Exh. B-1, at p.9.

other things, covering the costs of insuring the Scheduled Real Property.[41]  While the transfer was made directly from a Trust account at Edward Jones to the Bankruptcy Trustee, Suzann treated the transfer as a distribution to herself, as the primary beneficiary of the Trust, followed by her transfer to the Bankruptcy Trustee.[42]  At the time of his receipt of the $70,000, the Bankruptcy Trustee believed that the funds had come from Suzann alone.  He did not know that the Edward Jones account was a Trust account.[43]

Next, despite CM Resort's prior verified disclosure that its 100% equity owner is the MAR Living Trust,[44] the Bankruptcy Trustee, having obtained confirmation on behalf of Suzann that the $70,000 transfer was not intended as, and would not be deemed to constitute, a loan, temporarily booked the transfer as an equity contribution by Suzann to CM Resort based upon her claimed interest in CM Resort and its Scheduled Real Property on account of the Final Judgment. Thereafter, the Bankruptcy Trustee periodically utilized the $70,000 to pay insurance premiums for coverage of the Scheduled Real Property.[45]  By November 3, 2020, the full amount of the $70,000 had been used to pay for such insurance coverage.[46]

In April 2020, the Bankruptcy Trustee was presented with the opportunity to obtain post-petition financing for the benefit of the Estates from a non-traditional lending source.[47]  There still being no resolution to the Final Judgment appeal and facing increasing unpaid administrative

---

[41] *See* Bankr. Tee Exh. 3.

[42] *See* Docket No. 451 (Hearing Transcript, at 127:11-21).

[43] *See id.* (Hearing Transcript, at 242:1-2).

[44] The MAR Living Trust is a living trust that Michael and his wife allegedly established prior to the initiation of the Fiduciary Lawsuit.  The current beneficiaries of the MAR Living Trust are allegedly Michael's wife and two children. *See* Docket No. 50, at p.5.

[45] *See* Bankr. Tee Exh. 10.

[46] *See id*.; *see also* Docket No. 429, at pp.1-2.

[47] The proposed lender was Robin Phelan, a well-known bankruptcy practitioner within the Northern District of Texas.

expenses, the Bankruptcy Trustee sought approval of a $350,000 post-petition loan from such source for the purpose of funding ongoing costs of administration of the Estates, including continuing insurance coverage for and the payment of post-petition ad valorem taxes assessed against the Scheduled Real Property. The loan was to be secured by the Scheduled Real Property.[48] In June 2020, the loan was approved over Suzann's objection.[49]

Desiring to avoid the possibility of an eventual sale or other disposition of any of the Scheduled Real Property to repay the loan, in October 2020, Suzann again unilaterally and without any consultation with or the agreement of any of the Ruff Children arranged to have additional Trust funds transferred from the Trust's account at Edward Jones to the Bankruptcy Trustee – this time in the amount of $350,000, the same amount as the loan.[50] Once again, Suzann treated the transfer as a distribution to herself, as the primary beneficiary of the Trust, followed by her transfer to the Bankruptcy Trustee, and at the time of his receipt of the $350,000, the Bankruptcy Trustee believed that the funds had come from Suzann alone and did not know that they had originated from the Trust. Again, he temporarily booked the transfer as an equity contribution by Suzann to CM Resort.

## H.    *Resolution of the Trust Modification Order Appeal and the Ruff Children's Filing of an Initial Motion*

On December 3, 2020, the Dallas Court of Appeals issued its opinion with respect to the appeal of the Trust Modification Order (the "**Trust Modification Opinion**").[51] The opinion both affirmed the Trust Modification Order, finding no reversible error on the part of the Probate Court,

---

[48] *See* Docket No. 247.

[49] *See* Docket Nos. 253 (objection) and 274 (order).

[50] *See* Bankr. Tee Exh. 1.

[51] *See* Tr. Exh. B-1 (Trust Modification Opinion).

but also highlighted the appointment of the Ruff Children as Co-Trustees of the Trust, effective as of May 30, 2019, and the fact that the Trust Modification Order neither removed any of the Ruff Children as Co-Trustees nor appointed or approved the appointment of Suzann as a/the Trustee.[52]

This, then, caused Suzann to file a new emergency motion in the Trust Action on December 18, 2020 (the "**Clarification Motion**") to seek the Probate Court's entry of an order determining that the Trust Modification Order did, in fact, effectuate her appointment as the sole successor Trustee to Frost.[53] Separately, armed with the Trust Modification Opinion, the Ruff Children caused a motion to be filed in the bankruptcy case on behalf of the Trust on December 30, 2020, to request this Court's entry of an order compelling the Bankruptcy Trustee to either abandon or return to the Trust the $350,000 in Trust funds that Suzann had arranged to have transferred to the Bankruptcy Trustee in October 2020 (the "**Initial Motion**").[54]

Ultimately, in light of the pending Clarification Motion, the parties agreed to the entry of an order (the "**Agreed Restraining Order**") pursuant to which the Initial Motion would be denied without prejudice, but which would provide for the Bankruptcy Trustee's retention of possession of the $350,000 subject to the requirement that the Bankruptcy Trustee not spend any of the funds "absent further Order of the Court upon appropriate Motion and opportunity to be heard by all parties with all parties reserving their rights to object as to the ownership, character and/or use of the funds."[55]

---

[52] *See id.*, at p.9.

[53] *See* Tr. Exh. G.

[54] *See* Docket No. 360.

[55] *See* Docket No. 380.

**I.** **The Clarification Motion is Denied and the Current Motion is Filed**

On April 19, 2021, the Probate Court entered an order denying the Clarification Motion "without prejudice to the right … of Suzann Ruff to apply to the Court for removal or replacement of the Children as Co-Trustees…."[56] Shortly thereafter, on April 22, 2021, the Ruff Children caused the Trust to file the current Motion.

## DISCUSSION

**A.** **The Asserted Bases for Relief and Responses Thereto**

Pursuant to the Motion, the Trust (by and through the Ruff Children as Co-Trustees of the Trust) requests the entry of an order compelling the Bankruptcy Trustee to "return" the $420,000 in Trust funds transferred by Suzann. While no legal basis for such relief is recited within the Motion, the Trust asserts that such relief is warranted based upon the following key facts: (1) that, as determined by the Dallas Court of Appeals and thereafter the Probate Court, the Ruff Children were Co-Trustees of the Trust at the time of Suzann's transfer of both the initial $70,000 and the subsequent $350,000; (2) that, by failing to obtain the approval of a majority of the Ruff Children for the transfers, Suzann did not have the authority under the terms of the Trust Agreement to make the transfers; and (3) that the relief requested is contemplated by the Agreed Restraining Order under which the Bankruptcy Trustee, according to the Trust, "agreed not to spend funds from Suzann Ruff absent further Order of this Court."[57]

In her Response to the Motion, Suzann focuses predominantly on various actions taken by Michael, certain of the Ruff Children, and their counsel to allegedly obstruct and cause delay in Suzann's efforts to recover on the Final Judgment. She does this to portray the Motion as nothing

---

[56] See Tr. Exh. G.

[57] See Motion, ¶ 9.

more than the latest chapter in an alleged pattern of obstruction and delay.  Not until page 9 of the Response does Suzann finally get to the gist of her legal argument, being that the Ruff Children are allegedly disqualified to serve as the Co-Trustees of the Trust and that the Court should, therefore, refrain from taking any action on the Motion until the Probate Court has had the opportunity to consider Suzann's request for removal of the Ruff Children as Trustees of the Trust and the approval of the appointment of Suzann as the sole successor Trustee.

In his Response to the Motion, the Bankruptcy Trustee takes a bifurcated approach.  First, with respect to the initial $70,000 transfer, the Bankruptcy Trustee asserts that he has no ability to "return" such funds to the Trust because they have already been spent to secure insurance coverage for the Scheduled Real Property.[58]  Moreover, he highlights the fact that, contrary to the Trust's suggestion that the Agreed Restraining Order applied to the entire $420,000 in transferred funds, the initial $70,000 is neither mentioned within the Initial Motion nor within the Agreed Restraining Order.  As for the subsequent $350,000 transfer, the Bankruptcy Trustee largely characterizes the dispute as a two-party dispute between Suzann and the Ruff Children.[59]  At the same time, however, because of the insufficiency of funds to continue to preserve and administer the Estates, he requests that he be permitted to retain possession of the full amount of the $350,000 subject to the continuing requirement that none of the funds be used without prior court approval.[60]

Pursuant to the Trust's Reply, in addition to supplementing the prior request for return of the funds to more specifically allege that the funds were "illegally transferred to Suzann and [the

---

[58] While the Bankruptcy Trustee now appears to be amenable to the possibility of an after-the-fact allowance of an administrative expense claim for the use of such funds, *see* Trustee's Response, ¶ 3, to date no request for the allowance of such a claim has been made in the bankruptcy case.

[59] *See* Trustee's Response, ¶ 8.

[60] *See id.*

Bankruptcy Trustee]" and continue to "belong[ ] to the Trust,"[61] the Trust adds that the funds were also "fraudulently transferred to [the Bankruptcy Trustee]" and, thus, "are subject to the Texas Uniform Fraudulent Transfer Act ('TUFTA')."[62] The Trust also requests that the Bankruptcy Trustee be required to "account for the Funds to the extent that all $420,000 is not in [the Bankruptcy Trustee's] IOLTA account."[63]

Likely in reaction to the newly-asserted bases for relief in the Reply, at the hearing counsel for Suzann supplemented Suzann's response to assert that (1) the relief sought by the Trust is relief that may only be pursued under a separately-initiated adversary proceeding governed by the procedural rules applicable to adversary proceedings, (2) pursuant to section 7.8 of the Trust Agreement, the Ruff Children have no recourse with respect to the transfers, and (3) irrespective of any lack of compliance with the terms of the Trust Agreement, the transferred funds became property of the CM Resort Estate pursuant to 11 U.S.C. § 541(a)(7). Similarly, at the hearing counsel for the Bankruptcy Trustee joined in Suzann's adversary proceeding and § 541(a)(7) bankruptcy estate objections.

## B. *Procedural Considerations; Matters Properly Before the Court*

Ordinarily, a proceeding to recover money or property or to obtain injunctive or other equitable relief constitutes an adversary proceeding governed by the procedural rules of Part VII of the Federal Rules of Bankruptcy Procedure.[64] The parties may waive the requirement of an

---

[61] *See* Reply, ¶¶ 3-4.

[62] *See id.*, ¶¶ 5-6, 29.

[63] *See id.* (prayer for relief).

[64] *See* Fed. R. Bankr. P. 7001(1) and (7) ("An adversary proceeding is governed by the rules of this Part VII. The following are adversary proceedings: (1) a proceeding to recover money or property [excluding certain inapplicable proceedings] [and] (7) a proceeding to obtain an injunction or other equitable relief [excluding certain inapplicable scenarios]….").

adversary proceeding and the procedural protections provided thereby, however, by agreement or by failing to timely object.[65]

Here, the parties have waived the requirement of an adversary proceeding in relation to the Trust's request for the "return" of the $420,000 in transferred funds. Importantly, in finding such waiver, the Court construes the Trust's request for the "return" of such funds as a request for the entry of an order directing the Bankruptcy Trustee to release the funds to the Trust to the extent such funds remain in the possession, custody or control of the Bankruptcy Trustee, as opposed to a claim for monetary damages against the Bankruptcy Trustee or the Estates. In this regard, under the terms of the Agreed Restraining Order, the parties agreed that any further disposition of the $350,000 in transferred funds would not occur except on order of the Court "upon appropriate Motion" subject to the right of the parties to "object as to the ownership [and] character" of such funds.[66] In other words, the parties, themselves, agreed to the Court's determination of ownership and further disposition of the $350,000 on motion (a contested proceeding) as opposed to an adversary proceeding. Second, in relation to all of the funds at issue, pursuant to their respective Responses, neither Suzann nor the Bankruptcy Trustee objected to the Motion on the basis of the Trust's failure to initiate an adversary proceeding. Not until the time of the hearing was such procedural objection first raised, which is too late.

That said, as previously indicated, the Trust's request for relief *pursuant to the Motion* is limited to a request for the "return" or release of the amount of the $420,000 in transferred funds still in the possession, custody or control of the Bankruptcy Trustee. Not until the Reply did the

---

[65] *See In re Colella*, Case No. 19-41358, 2020 WL 1968241, at *5 (Bankr. N.D. Ohio Apr. 23, 2020); *In re Windham*, 568 B.R. 263, 265 (Bankr. N.D. Miss. 2017); *In re Hayden*, 477 B.R. 260, 264 n.3 (Bankr. N.D. Ga. 2012); *In re Print Serv., Inc.*, No. 09-20861, 2011 WL 597032, at *1 and n.1 (Bankr. W.D. La. Feb. 11, 2011).

[66] *See* Agreed Restraining Order, at p.2.

Trust supplement the skeletal assertions of the Motion to add the new fraudulent transfer and accounting claims. It is procedurally improper, however, for a moving party to wait until the time of the filing of its reply to assert entirely new claims for relief.[67] Consequently, such newly asserted claims will be disregarded and not considered by the Court.[68]

**C.    The Trust's Request for Return of the Funds at Issue**

While the Trust fails to specify any particular legal theory within the Motion for return of the $420,000 in funds, the request most closely resembles a common law claim for money had and received. Under Texas law, to succeed on a claim for money had and received, a plaintiff must show (1) that the defendant holds money (2) which in equity and good conscience belongs to the plaintiff.[69]

**1.    Funds Held by the Bankruptcy Trustee/Estates**

Turning to the first of the two elements of the Trust's claim for money had and received (that the Bankruptcy Trustee holds the money), the evidence is clear that the Bankruptcy Trustee continues to hold $350,000 of the $420,000 in funds transferred at Suzann's direction. Both prior to the filing of the current Motion as well as the filing of the Initial Motion and the Court's entry

---

[67] *See* Fed. R. Bankr. P. 9014(a) ("In a contested matter …, relief shall be requested **by motion**, and **reasonable notice** and opportunity for hearing **shall be afforded the party against whom relief is sought**") (emphasis added).

[68] Importantly, if the Court were to instead treat such claims as having been timely asserted, the claims would still be subject to dismissal without prejudice based upon the procedural objections raised by Suzann and the Bankruptcy Trustee at the hearing. While the procedural objections were untimely in relation to the request for "return" of the funds made in the Motion, they were timely made in relation to the newly asserted claims because neither Suzann nor the Bankruptcy Trustee had the opportunity to raise the procedural objections in their respective Responses to the Motion. Moreover, in relation to the fraudulent transfer claims, the Trust failed to present evidence of, among other things, its standing as a creditor for purposes of TUFTA and any fraudulent intent on the part of the Trust towards its creditors and/or the Trust's insolvency at the time of each of the transfers. *See* Tex. Bus. & Com. Code §§ 24.005(a), 24.006 and 24.008. And in relation to the request for an accounting, it would appear that the request is now moot by virtue of the Bankruptcy Trustee's introduction of Bankr. Tee Exh. 10 and his testimony with respect to disposition of the initial $70,000 transfer.

[69] *Staats v. Miller*, 243 S.W.2d 686, 687 (Tex. 1951); *Tri-State Chems., Inc. v. Western Organics, Inc*., 83 S.W.3d 189, 194-95 (Tex. App. – Amarillo 2002, pet. denied); *Miller-Rogaska, Inc. v. Bank One, Texas, N.A*., 931 S.W.2d 655, 662 (Tex. App. – Dallas 1996, no writ).

of the Agreed Restraining Order, the Bankruptcy Trustee had already spent the original $70,000 in transferred funds on insurance coverage for the Scheduled Real Property.[70] Therefore, inasmuch as the Bankruptcy Trustee no longer holds the initial $70,000 in transferred funds, the Trust's request for return of this portion of the $420,000 will be denied.

### 2. Ownership of the Funds in Equity and Good Conscience

Focusing on the remaining $350,000, multiple issues are raised by the parties in relation to the second element of the Trust's claim for money had and received (ownership in equity and good conscience). The Court will begin its analysis with the status of ownership as of the time of the initiation of the transfer.

It is undisputed that the $350,000 in funds ultimately transferred to the Bankruptcy Trustee was part of the Trust res prior to the transfer. With that in mind, based upon the rulings of the Dallas Court of Appeals and the Probate Court, it is clear that as of both the time of Suzann's direction to Edward Jones to initiate the $350,000 transfer and the time of the transfer itself, the Ruff Children were Co-Trustees of the Trust. As such, under the terms of the Trust Agreement, authorization for the $350,000 transfer required a vote of the majority of the Co-Trustees. *See* Trust Agreement § 8.4A ("The powers, duties, and authority of the Trustee shall be exercised by it as follows: … [e]xcept as otherwise provided herein, the rights, powers, duties, and discretions of the Trustee shall be exercisable by the Trustee jointly or, if more than two Trustees, by vote of the majority"). It is undisputed that Suzann never requested nor obtained a vote of a majority of the Co-Trustees authorizing the $350,000 transfer.

---

[70] *See* Bankr. Tee Exh. 10; *see also* Docket No. 429 (agreed order in resolution of the Bankruptcy Trustee's motion to pay consulting engineer in which the Trust acknowledges the Bankruptcy Trustee's expenditure of the full amount of the $70,000 by November 3, 2020).

Notwithstanding same, Suzann claims that section 7.8 of the Trust Agreement precludes the Trust from pursuing recovery of the funds from the Bankruptcy Trustee. The Trust takes issue with such proposition, arguing that section 7.8 is inapplicable. The Court agrees with the Trust. Section 7.8 provides as follows:

> Limitation on Remedies. If any Trustee enters into any transaction which would, in [the] absence of this instrument, have been prohibited pursuant to Section 113.052, 113.053, 113.054 or 113.055 of the Texas Trust Code, or that would be considered to be "self-dealing" under common law, and if such transaction is determined to have constituted a breach of trust, the *beneficiaries'* remedies shall not include the right to set aside or void the transaction, but instead shall be limited to any rights or remedies *the beneficiaries* may have against the Trustee for losses occurring as a result of the breach.

Trust Agreement § 7.8 (emphasis added). As evidenced by the italicized language above, section 7.8 limits the remedies of the *beneficiaries* of the Trust, but not of the Trust or of the Trustees acting on behalf of the Trust. And while it is true that each of the Ruff Children is a secondary beneficiary of the Trust, the Ruff Children have not taken action in this case in their capacity as beneficiaries of the Trust; instead, they have taken action on behalf of the Trust in their capacity as Co-Trustees of the Trust. Therefore, the Motion is not defeated by virtue of section 7.8 of the Trust Agreement.

Next, both Suzann and the Bankruptcy Trustee rely on section 541(a)(7) of the Bankruptcy Code for the proposition that the Estates acquired ownership of the $350,000 upon the Bankruptcy Trustee's receipt of the funds. The Trust disputes such contention. Here, again, the Court agrees with the Trust. "To determine whether something is property of the bankruptcy estate, a court must look to both state and federal law."[71] While federal law (*i.e.*, applicable provisions of the Bankruptcy Code) dictates what interests in property constitute property of the bankruptcy estate,

---

[71] *Croft v. Lowry (In re Croft)*, 737 F.3d 372, 374 (5th Cir. 2013).

"Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law" because "[p]roperty interests are created and defined by state law."[72]

With the foregoing in mind, section 541 of the Bankruptcy Code dictates what interests in property constitute property of a chapter 11 debtor's bankruptcy estate. Among other things, section 541(a)(7) provides that the bankruptcy estate includes "[a]ny interest in property that the estate acquires after the commencement of the case."[73] Thus, according to Suzann and the Bankruptcy Trustee, upon the Bankruptcy Trustee's receipt of the $350,000, the CM Resort Estate obtained an interest in such funds, even if only a possessory interest. Based upon such contention, they appear to argue that the existence of the CM Resort Estate's interest in the funds is sufficient to defeat the Motion. The Court disagrees.

Section 541 of the Bankruptcy Code simply serves as the starting point of the analysis of the CM Resort Estate's interest in the funds. It is also necessary to consider applicable state law in determining the *nature* and *extent* of such interest and the *property rights* associated therewith. Under Texas law, for example, it has long been held as a general matter that the true owner of personalty that is stolen or wrongfully taken from such owner may recover the personalty from anyone who has received it and exercised dominion over it. "This is so because … a thief cannot pass good title" of such property to another.[74] Applying this general rule to the evaluation of the nature and extent of a bankruptcy estate's interest in personalty acquired under section 541(a)(7) of the Bankruptcy Code, while the estate may indeed acquire some form of bare possessory interest

---

[72] *Butner v. United States*, 440 U.S. 48, 54-55 (1979); *see also Haber Oil Co., Inc. v. Swinehart (In re Haber Oil Co., Inc.)*, 12 F.3d 426, 435 (5th Cir. 1994) ("in the absence of controlling federal bankruptcy law, the substantive nature of the property rights held by a bankrupt and its creditors is defined by state law").

[73] 11 U.S.C. 541(a)(7).

[74] *See Tri-State Chems., Inc.*, 83 S.W.2d at 195 (citing among other cases *McKinney v. Croan*, 188 S.W.2d 144, 146 (Tex. 1945)).

in stolen or wrongfully taken personalty, the estate does not acquire legal title to such personalty. And nothing within section 541 of the Bankruptcy Code operates to improve the nature of the estate's interest in such personalty.[75] Hence, because such personalty is of no value and benefit to the estate,[76] the return of such personalty to its rightful owner is appropriate in the face of a meritorious claim for such return.[77]

In the case of money, however, a possible exception to the general rule exists. Specifically, "[o]ne who receives money which has been illegally obtained by a third party in due course of business, in good faith, and for valuable consideration, can keep it without liability to him from whom it was stolen."[78] While such exception provides meaningful protection to an innocent transferee, it is inapplicable to the case at hand because no consideration has been provided by the Bankruptcy Trustee on behalf of any of the Estates in exchange for the funds. As explained by the Bankruptcy Trustee, not only was the $350,000 in transferred funds unsolicited by the Bankruptcy Trustee, but he obtained confirmation on behalf of Suzann that the funds were not provided with any expectation that they be treated as a loan. Instead, they were provided with the sole expectation that they effectively be used to preserve and protect the Scheduled Real Property. To date, however, none of the funds have been used for such purpose due to the limitations imposed by the Agreed Restraining Order. Moreover, while the Bankruptcy Trustee has temporarily "booked" the

---

[75] *Cf.* 11 U.S.C. § 541(d) (providing that property in which the debtor holds only legal title and not an equitable interest as of the commencement of the case becomes property of the estate only to the extent of the debtor's legal title, but not to the extent of any equitable interest in the property that the debtor does not hold).

[76] *See, e.g.*, 11 U.S.C. § 363(e) (providing for the prohibition or condition of a bankruptcy trustee's right to use property of the estate in which another entity has an interest to the extent necessary to provide adequate protection of such entity's interest in such property).

[77] *See, e.g.*, 11 U.S.C. § 554(b) (authorizing the entry of an order compelling a bankruptcy trustee to abandon property of the estate that is of inconsequential value and benefit to the estate).

[78] *Sinclair Houston Fed. Credit Union v. Hendricks*, 268 S.W.2d 290, 295 (Tex. Civ. App. – Galveston 1954, writ ref'd n.r.e.); *see also Tri-State Chems., Inc.*, 83 S.W.3d at 195.

transfer as an equity contribution by Suzann to CM Resort, to date Suzann has never been recognized as an equity owner of CM Resort. Thus, the section 541(a)(7) argument advanced by Suzann and the Bankruptcy Trustee is equally unconvincing.

Finally, relying upon concepts of equity and good conscience, both Suzann and the Bankruptcy Trustee argue that the Court should refrain from ordering return of the $350,000 to the Trust at this time – in Suzann's case, until the Probate Court has the opportunity to rule on a motion to disqualify the Ruff Children as Co-Trustees of the Trust; and in the Bankruptcy Trustee's case, based upon the need for the funding of ongoing expenses of administration of the Estates and the protection afforded by the necessity of prior court approval before any of the funds are used. The Trust takes issue with both arguments, asserting that they do not serve as a basis to forestall return of the funds to the Trust and that the funds are needed by the Trust to provide for the ongoing care of Suzann as the Trust's primary beneficiary. While the Court questions the Ruff Children's motives, ultimately the Court is not convinced that either of the arguments advanced by Suzann and the Bankruptcy Trustee is sufficient in equity and good conscience to alter the determination of ownership of the funds.

First, while the Probate Court has left open the possibility of disqualification of the Ruff Children as Trustees of the Trust, counsel for Suzann acknowledged at the hearing that any such successful disqualification would be prospective only. In other words, it would not change the fact that Suzann lacked the authority to effectuate the $350,000 transfer from the Trust to the Bankruptcy Trustee when made. Second, while Suzann may hereafter be determined to hold an interest in CM Resort, certain of the other Debtors, and/or some or all of the Scheduled Real Property by virtue of the Arbitration Award, Final Judgment, Fraud Lawsuit and/or Fraud Adversary, such that Suzann may well have a vested interest in seeing that the Scheduled Real

Property is preserved and protected, no evidence was presented of how the preservation and protection of the Scheduled Real Property would inure to the benefit of the Trust, itself, as opposed to Suzann, individually.

### CONCLUSION

For all of the foregoing reasons, on the basis of the Trust's implied claim for money had and received, the Court finds that the Trust has successfully established cause for the Bankruptcy Trustee's immediate return to the Trust of $350,000 of the $420,000 of Trust funds transferred to the Bankruptcy Trustee, but that all other relief requested in the Motion should be denied.

### ORDER

Accordingly, it is hereby:

**ORDERED** that Motion be and is hereby GRANTED IN PART, AND DENIED IN PART, as follows:

1. The Bankruptcy Trustee is hereby directed to return to the Trust the $350,000 in funds received from the Trust's Edward Jones account at the direction of Suzann, plus any interest (if any) earned thereon by the Bankruptcy Trustee or any of the Estates from the date of the Bankruptcy Trustee's receipt of the $350,000 through the date of the return of such funds to the Trust.

2. The Trust's request for return of the remaining $70,000 in funds received from the Trust's Edward Jones account at the direction of Suzann is denied.

3. The Trust's assertion of claims for the avoidance and recovery of any fraudulent transfers and for an accounting set forth within the Reply are denied without prejudice.

4. All other relief sought in the Motion that is not expressly addressed in paragraphs 1-3 above is hereby denied with prejudice.

It is further

      **ORDERED** that the Court shall retain jurisdiction with respect to the interpretation and enforcement of this Memorandum Opinion and Order.

      # # #   END OF MEMORANDUM OPINION AND ORDER   # # #