Joyce W. Lindauer
State Bar No. 21555700
Lindauer & Vaughn
117 S. Dallas Street
Ennis, Texas 75119
Telephone: (972) 503-4033
Facsimile: (972) 503-4034
*Attorneys for CM Capital Group LLC*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| CM RESORT LLC *et al.*, | § | Case No. 18-43168-elm11 (jointly administered with No. 18-43561 and 18-43562) |
| Debtor. | § | |
| | § | |
| | § | |

# REPLY IN SUPPORT OF MOTION TO ADMINISTRATIVELY REOPEN CASES AND TO ENFORCE FINAL SALE ORDERS

CM Capital Group LLC ("***CM Capital***"), purchaser under the Sale Orders and owner of the Property, files this *Reply in Support of Motion to Administratively Reopen Cases and to Enforce Final Sale Orders* (the "***Reply***") in response to the one-page letter response of Suzann Ruff (the "Response"), and states:

## INTRODUCTION

CM Capital has consistently maintained that this Court – the court that entered the Sale Orders – is the proper court to interpret and enforce them. Suzann's Response incorrectly asserts the opposite: that CM Capital agreed that interpretation or enforcement of the Sale Orders should be left to another forum. The bankruptcy record establishes otherwise. CM Capital previously moved this Court to enforce the Sale Orders, expressly invoked this Court's jurisdiction, and maintained that Suzann's asserted interest was preserved against the sale proceeds rather than the Property. It was Suzann – not CM Capital – who argued that the effect of the Sale Orders should be determined "somewhere else" and that this Court lacked jurisdiction.

35254861-9

CM Capital is not Michael Ruff, a judgment debtor, or a party to the underlying Ruff family disputes. It is a separate limited liability company capitalized by twenty-six investors – among them entrepreneurs, physicians, pilots, real-estate developers, and public servants – who contributed their own funds to purchase the Property through this Court's auction. Using that money, CM Capital paid $7,300,002 for the Property. Since closing, CM Capital has possessed, insured, maintained, repaired, and improved the Property and has spent at least $500,000 to preserve, operate, improve, and carry it in reliance on the Sale Orders. Suzann's position would leave CM Capital and its investors without the Property, without any return of the purchase price, and without reimbursement of CM Capital's substantial post-closing expenditures. [APP 1, Ruff Decl. ¶¶ 3-12; Reply APP 1, Supp. Ruff Decl. ¶¶ 3-5, 10-13].

The need for this Court to interpret and enforce its Sale Orders is no longer abstract. In the state proceedings, Suzann has attributed consequences to those Sale Orders that this Court never imposed. Her counsel told the Probate Court that the Trustee's deeds "are void," that the bankruptcy sale involved only "conditional deeds, the legal title," and that "there was nothing to sell." [Reply APP 2, 1/9/26 Tr. 28:13-14, 37:9-15, 38:11-18]. In Palo Pinto, counsel argued that "the effect of the Fifth Circuit ruling is that these deeds are moot" because the deed was "no good if Suzy wins the appeal." [Reply APP 3, 3/13/26 Tr. 60:8-18]. Neither the phrase "subject to the Appeals" nor this Court's later oral bare-legal-title analysis declared the Trustee's deeds void or moot. To the contrary, this Court expressly held: "The Sale Order still stands. The Transaction that occurred pursuant to the Sale Order still stands." [APP 19, Tr. 9:8-10]. The state-court characterization cannot be reconciled with that ruling, making an authoritative interpretation by the court that entered the Sale Orders necessary and proper.

The Immediate Remand Order concerning PR-11-2825-2 addressed a fundamentally different matter: Michael Ruff's eve-of-hearing attempt to remove Suzann's motion in the probate case between Suzann and Michael – a case to which CM Capital was not, and never had been, a party. CM Capital did not file or join the removal and did not present its purchaser rights for adjudication in that proceeding. The Court exercised **discretionary abstention** and equitable-remand authority over the particular **matters removed in that adversary proceeding**. It did not adjudicate CM Capital's title, § 363(m) rights, paragraph E(d), or the Sale Orders' free-and-clear, reattachment, and bar-and-estoppel provisions.

The present Motion is filed by CM Capital itself in the bankruptcy cases in which the Sale Orders were entered. CM Capital does not ask this Court to redetermine whether, or to what property, Suzann's constructive trust attached before the sale. It asks this Court to determine the post-sale effect of its own unstayed, consummated Sale Orders on that adjudicated interest – a question that was not presented for adjudication in the removed proceeding because CM Capital was neither a party to the Probate Action nor a removing party in the adversary proceeding.

**A. The Response does not answer the merits of the Motion.**

1. The Motion establishes, on independent grounds, that the Sale Orders conveyed the defined Property to CM Capital free and clear as provided in those Orders; that any disputed interest was detached from the Property and reattached to the proceeds; that Suzann requested and received more than $4.5 million in those proceeds and may not assert the same interest against the Property; that § 363(m) protects the validity of the consummated sale because no stay was ever entered; and that paragraph E(d) included the entire adversary proceeding and related appeal among the Litigation Interests removed from the Property regardless of outcome. The Response offers no substantive answer to any of these grounds. It does not mention § 363(m), Suzann's request for and receipt of the proceeds, the reattachment provision, paragraph E(d), the purchaser

evidence, or the text of the Sale Orders. Those matters therefore remain unrebutted and, at minimum, cannot properly be resolved through the summary denial Suzann requests without consideration of the Motion, the Sale Orders, and CM Capital's evidence.

2. Suzann's silence on the merits is particularly significant because she directly litigated the sale authorization before closing. Her objection to the auction results asked this Court to reject CM Capital's winning bids, deny CM Capital the protection of § 363(m), and award the same Properties to the backup bidders. Her requested remedy itself presupposed that the Trustee was selling the Properties – not an empty title shell: she asked that those same Properties be conveyed to different purchasers. She challenged CM Capital's proof of funds, the Trustee's auction procedures, and CM Capital's good faith. She did not contend that the Trustee was selling only bare legal title, that the proposed deeds were merely conditional instruments, or that the deeds would automatically become void or moot if she prevailed in the separate appeal. [Dkt. 993]. After an evidentiary hearing, this Court overruled all of Suzann's objections, found that the Trustee had exercised sound business judgment, found that "there's obviously been no objection to the free and clear nature of the transactions," approved CM Capital as the winning bidder for all three Properties, and held that CM Capital was entitled to the good-faith-purchaser protections of § 363(m). [Reply APP 4, July 28, 2023 Tr. 123:1-16, 124:7-126:25].

3. Thus, before the sales closed, Suzann challenged CM Capital's selection and § 363(m) status; this Court rejected those challenges after an evidentiary hearing; Suzann sought a stay; the stay was denied; she appealed the Sale Orders; and she voluntarily dismissed those appeals. She cannot now obtain through a post-closing characterization of the deeds the relief she failed to preserve through a stay and direct review.

4. **Suzann cannot keep both the purchase money and the Property.** Her state-court theory begins by rewriting the asset and conveyance that the court-approved transaction documents required. The Bid Procedures Order required each competing bidder to execute the same prescribed form of Contract of Sale. That form did not describe the asset as bare legal title, a conditional deed, or whatever interest the estates might later be determined to own. It defined the "Property" as the land, buildings, improvements, appurtenances, and related rights. More specifically, section 6.4(a)(1) required the Trustee at closing to deliver a Special Warranty Deed conveying that defined Property to CM Capital "in indefeasible fee simple, free and clear of any lien, encumbrance or exception other than the Permitted Exceptions." [Dkt. 943 at 3; Trustee Ex. 27, Dkt. 991-26 at 1-5]. The deeds' special-warranty covenant limited the Trustee's warranty obligations; it did not alter the estate conveyed.

5. The Permitted Exceptions disclosed specified matters subject to which the fee-simple estate was conveyed, but none carved out an ownership estate, reserved title in Suzann, reduced the estate conveyed to bare legal title, or made CM Capital's title automatically defeasible. The conveyance was subject only to the lawful effect, if any, of the matters identified. Exception 2 did not identify or reserve Suzann's asserted ownership as a subsisting Property Interest burdening CM Capital's title. Instead, it recited that this Court's Amended Final Judgment had "den[ied] Suzann Ruff's competing claims to ownership of the Property and therefore confirm[ed] that the Property is property of" the estates. The only adverse proceeding identified in Exception 2 was Suzann's then-pending appeal in Case No. 4:22-cv-0135-P. [Trustee Ex. 27 at 28 (Ex. B to Special Warranty Deed)].

6. A pending appeal is a judicial proceeding – not itself an easement, lien, constructive trust, reversionary estate, or other interest in land. Its inclusion among the Permitted Exceptions

disclosed the pending appeal and confirmed that CM Capital took the conveyance with notice of that proceeding. But the label "Permitted Exception" did not itself create or enlarge a Property Interest or prescribe the consequence of appellate success. Exception 2 did not state that reversal would void the Trustee's deed, terminate CM Capital's estate, revest the Property in Suzann, require reconveyance, or permit CM Capital to be divested without restoration of its purchase price. It identified a proceeding that could determine Suzann's pre-sale interest; it did not itself supply any post-closing effect.

7. The Sale Orders – not the label "Permitted Exception" – supplied the operative post-closing consequences of the litigation identified in Exception 2. The Contract required the Trustee to convey the defined Property in indefeasible fee simple, and the Trustee's deed effectuated that conveyance subject to the listed Permitted Exceptions. Paragraph E(d) separately included the same adversary proceeding and related appeal among the Litigation Interests governed by the Sale Orders. The appeal could continue and determine whether Suzann possessed a pre-sale interest; but paragraph E(d), the reattachment provision, and the bar-and-estoppel provisions determined where any such interest could operate after closing. The Sale Orders preserved any such interest against the proceeds and prohibited its later assertion against CM Capital or the Property. Put simply, Exception 2 disclosed the pending appellate challenge; it did not reserve Suzann's asserted ownership in CM Capital's title. It identified the proceeding – it did not preserve the Property as the post-closing res.

8. The standardized "as is, where is, and with all faults" provision does not supply the missing automatic-divestiture language. Section 8.16 broadly disclaimed warranties and representations concerning title – other than the title warranty contained in the required Special Warranty Deed – along with zoning, taxes, physical and environmental conditions, access,

operating history, projections, valuation, governmental approvals, marketability, suitability, construction, and repair. Those limitations governed CM Capital's recourse against the Trustee; they did not reduce the estate conveyed, redefine the Property as bare legal title, state that CM Capital's deed would disappear if Suzann prevailed, or eliminate the Sale Orders' free-and-clear, reattachment, bar-and-estoppel, and § 363(m) provisions. Nothing in the prescribed contract identifies, quantifies, or allocates any portion of the final auction price as a discount specifically attributable to Suzann's appeal, the purchase of bare legal title, or an automatic-divestiture risk. [Trustee Ex. 27 at 10-11, 24-25, 28].

9. The bidding history confirms why the generic "discounted" language cannot be converted into a negotiated litigation discount. CM Capital was required to sign the prescribed form before the auction with qualifying bids totaling $4,900,000 – $4,100,000 for CM Resort and $400,000 for each of the other two Properties. Competitive bidding then increased CM Capital's aggregate price to $7,300,002: $6,300,000 for CM Resort and $500,001 for each of the Specfac and Sundance Lodge Properties. The standardized language was neither renegotiated nor recalculated as the aggregate price increased by $2,400,002. [Reply APP 1, Supp. Ruff Decl. ¶¶ 4-5, 16-19; Dkt. 943 at 3-4; Reply APP 4, July 28, 2023 Tr. 110:1-111:25, 126:4-24]. That history does not establish that the standardized disclaimer had no effect on value. It establishes that the transaction documents did not identify or price a temporary deed, bare legal title, or a risk that CM Capital's title would automatically disappear without any return or offer to return any portion of its purchase price.

10. Mark Ruff's Prior and Supplemental Declarations confirm that the protections Suzann now seeks to eliminate were not incidental to the transaction. The complete transfer of the defined Property, paragraph E(d), reattachment of disputed interests to the proceeds, the bar against

later assertion of those interests against CM Capital or the Property, and the good-faith-purchaser and § 363(m) protections were integral to CM Capital's bid and decision to close. CM Capital would not have paid $7,300,002 if the Sale Orders had stated that a later appellate ruling could divest its title without restoration of its purchase price. Since closing, CM Capital has possessed, insured, maintained, repaired, and improved the Property and, in addition to the purchase price, has spent at least $500,000 to preserve, operate, improve, and carry it. [APP 1, Ruff Decl. ¶¶ 4-11; Reply APP 1, Supp. Ruff Decl. ¶¶ 4-13]. Those purchaser-specific facts matter because a provision is integral when altering it would "adversely alter the parties' bargained-for exchange." *In re RE Palm Springs II, L.L.C.*, 106 F.4th 406, 417 (5th Cir. 2024).

11. More fundamentally, Suzann's theory cannot account for the purchase money on either possible view of the transaction. If the sale transferred the Property's beneficial value, then Suzann's interest followed the transaction into the proceeds she requested and received. If, as Suzann now contends, her beneficial interest never left the Property and only defeasible legal title was transferred, then CM Capital's $7.3 million cannot simultaneously constitute the substitute res of a beneficial interest that was never transferred or converted.

12. The Texas Supreme Court recognizes the same transferor-transferee distinction. Once trust property has been sold and the transferor no longer owns or controls it, relief against the transferor lies in the proceeds or value of the property. *In re Trust A & Trust C*, 690 S.W.3d 80, 90–91 (Tex. 2024). Here, the Sale Orders define CM Capital's transferee rights and defenses: they directed disputed Property Interests to the sale proceeds and barred their later assertion against CM Capital or the Property.

13. The same asset cannot be treated as bare legal title when determining what CM Capital received, but as the Property's beneficial value when determining what Suzann received.

Nothing in the Sale Orders permits CM Capital to lose both the defined Property and the purchase money it supplied.

14. The result does not depend on whether the Distribution Order used the word "election" or whether the distribution satisfied every dollar of Suzann's personal judgment. It depends on the identity of the funds she requested and received. At the disbursement hearing, Suzann's counsel described the requested relief as distributing the money to her "as provided for in the order which said that her property interest would attach to the proceeds." [APP 17, Tr. 5:20-23]. Suzann requested the entire remaining sale fund and then received more than $4.5 million expressly designated as "Constructive Trust" distributions. [APP 16; APP 18; APP 20]. The Distribution Order transferred money; no deed or federal order conveyed the Property to Suzann, canceled the Trustee's deeds to CM Capital, reduced the estate conveyed, or directed CM Capital to reconvey or surrender the Property. Whatever label is applied, she accepted the proceeds as the post-sale res of the same beneficial interest she now asserts against CM Capital's Property.

15. The Sale Orders confirm the same result and determine where any interest established through the appeal would operate after closing. Paragraph E(d) specifically included the entire adversary proceeding and its related appeal – the same litigation disclosed as pending in the transaction documents – among the Litigation Interests governed by the Sale Orders. Read together, the general "subject to the Appeals" language preserved prosecution and adjudication of the appeal, while the more specific paragraph E(d), reattachment, and bar-and-estoppel provisions fixed the post-closing res against which any resulting interest could operate. The Sale Orders directed the Property Interests to "reattach to the proceeds" and forever barred their assertion against CM Capital or the Property. A reading under which the appeal continued but any resulting interest operated against the proceeds gives effect to all of those provisions. A reading under which

success on appeal automatically nullified the Trustee's deeds leaves paragraph E(d), reattachment, and the bar-and-estoppel provision with no independent work to perform. That sequence gives each federal ruling its proper role: the appeal determined Suzann's pre-sale interest; the Sale Orders fixed the post-sale res against which that interest could operate; and the Distribution Order implemented the remedy against the proceeds. No later federal ruling modified the Sale Orders, reduced the estate conveyed to CM Capital, canceled the Trustee's deeds, required reconveyance, or held that CM Capital's title was defeasible. Suzann's Response and her state-court arguments neither address the operative Sale Order provisions nor explain what function they serve under her construction.

16. The Response instead raises a single objection: that this Court has, in effect, already declined to involve itself in the parties' disputes over the Palo Pinto Property, and that CM Capital now asks the Court to "second guess" the state courts. That objection misreads both the Motion and the orders on which the Response relies.

17. The Response also identifies no basis to deny limited administrative reopening. The Administrative Closing Order expressly provided that nothing would prevent this Court from administratively reopening the cases "at any time and for any purpose." [APP 21]. The present Motion seeks no new administration of estate property and no reopening of the adversary merits; it seeks only interpretation and enforcement of final Sale Orders. The need to interpret and enforce those Orders in the face of recorded competing ownership claims constitutes "other cause" to reopen under 11 U.S.C. § 350(b). At minimum, the cases should be reopened and the disputed enforcement questions set for the evidentiary hearing requested by CM Capital.

**B. The Motion asks this Court to enforce its own Sale Orders, not to adjudicate the constructive trust or review a state judgment.**

18. The Response quotes this Court's statement that "you don't have the jurisdiction to determine" how "the constructive trust would apply to the property." That statement concerned a different question than the one the Motion presents. CM Capital does not ask this Court to redetermine the existence, validity, or pre-sale scope of Suzann's constructive trust, to adjudicate title as an original matter, or to review or reverse any state-court judgment. CM Capital accepts the adjudicated pre-sale interest. It asks this Court to determine the separate post-sale effect of its own Sale Orders on that interest – including the operation of their free-and-clear, reattachment, and bar-and-estoppel provisions – and to determine the consequences of Suzann's request for and receipt of the proceeds under this Court's Distribution Order. That request falls squarely within this Court's core and ancillary authority to interpret and enforce its own Sale Orders – authority that each Sale Order expressly retained by providing that this Court "shall retain jurisdiction to… interpret, implement and enforce the terms and provisions of this Order (including any injunctive relief provided in this Order)," and to decide "the status, nature and extent of the Property."

19. The sale framework independently confirms that understanding. The court-approved Bid Procedures provided that every Qualified Bidder participating in the auction was deemed to consent to this Court's core jurisdiction over disputes relating to the bidding process and "the construction and enforcement of the Qualified Bidder's contemplated transaction documents." [Dkt. 943 at 12]. The prescribed Contract of Sale likewise provided that any suit or action arising from the Contract would be subject to the jurisdiction of this Court. [Trustee Ex. 27 at 11, § 8.17]. CM Capital entered the auction and closed under a court-approved framework that expressly placed construction and enforcement of the transaction documents in this Court; it did not agree that this Court should surrender that authority to another forum.

20. A bankruptcy court's authority to construe and enforce its own § 363 sale order is settled. *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009); *In re RE Palm Springs II, L.L.C.*, 106 F.4th 406, 414–17 (5th Cir. 2024). The transfer of property out of the estate does not deprive the bankruptcy court of authority to enforce the sale it approved, and an order integral to and inseparable from enforcement of that sale remains a core matter. Thus, declining to adjudicate the constructive trust as an original matter did not surrender this Court's expressly retained authority to interpret and enforce the Sale Orders. That conclusion is also consistent with this Court's own May 8, 2025 ruling that a question concerning interpretation of its orders is "inherently a core proceeding." [Reply APP 5, May 8, 2025 Tr. 34:14-24]. Indeed, in resolving the disbursement of the sale proceeds, this Court confirmed that it was doing nothing to disturb the sale: "The Sale Order still stands. The Transaction that occurred pursuant to the Sale Order still stands." [APP 19, Tr. 9:8-10]. CM Capital asks only that the Court enforce the Orders it has already said remain in force.

**C. The Order of Immediate Remand neither decided nor precludes CM Capital's present Motion.**

21. The Response relies on this Court's January 8, 2026 Order of Immediate Remand [Adv. No. 26-04001-elm, Dkt. 4]. That order neither decided nor precludes CM Capital's present enforcement request. The order abstained from and remanded a discrete removed matter – Suzann's own "Motion to Partially Enforce Judgment," which she had filed in the Probate Action to "memorialize her title ownership," and which Michael Ruff then removed to this Court on the eve of a probate hearing. This Court, at Suzann's request, abstained under 28 U.S.C. § 1334(c)(1) and remanded under § 1452(b), so that the Probate Court could decide Suzann's motion "on its own." The Order itself emphasized that CM Capital was not a party to the Probate Action and did not join the Notice of Removal.

22. The Immediate Remand Order states that both CM Capital and Suzann had been "fairly adamant" that this Court should "keep its nose out" of further dealings involving the Palo Pinto Property. Respectfully, the record does not support attributing that position to CM Capital. In May 2025, CM Capital filed its Motion to Enforce § 363(m) Sale Orders and to Dissolve Lis Pendens in this Court [Dkt. 1182], expressly argued that "this Court has appropriate jurisdiction," and maintained that any rights Suzann might establish were limited to the proceeds – not the real estate sold to CM Capital. [Reply APP 5, May 8, 2025 Tr. 4:1-10]. In closing, CM Capital again argued that the Sale Orders left Suzann no rights or interests in the real estate and preserved any rights solely against the proceeds. [*Id.* at 4:20-25; 33:1-8].

23. CM Capital maintained the same position at the September 19, 2025 hearing. It argued that the Sale Orders transferred the entire bundle of rights and that any interest Suzann established attached to the sale proceeds. [Dkt. 1298, Tr. 39:1-41:16]. It was Suzann's counsel who told the Court that the issue "is going to have to be hashed out somewhere," that "this Court doesn't have jurisdiction," and that another court should determine the effect of the documents and appellate opinion. [Dkt. 1298, Tr. 7:18-9:2]. CM Capital never adopted that position and has never asked this Court to decline to interpret or enforce its own Sale Orders. Suzann's counsel later repeated the same attribution in Palo Pinto, telling that court that Judge Morris had "agreed with Suzy and with CM Capital" and "with us, both of us" that he lacked jurisdiction. [Reply APP 3, 3/13/26 Tr. 26:12-20]. That was counsel's characterization, not CM Capital's position, and the bankruptcy record quoted above establishes the contrary. The day after obtaining remand, Suzann's counsel likewise told the Probate Court that Judge Morris "no longer has jurisdiction over any of this." [Reply APP 2, 1/9/26 Tr. 6:1-7].

24. The Immediate Remand Order addressed only the forum for Suzann's removed Probate Court motion. Permissive abstention from that discrete removed proceeding was not an adjudication of CM Capital's rights or a prospective disclaimer of this Court's authority to enforce its Sale Orders. A court may abstain from adjudicating another court's title dispute and still enforce the terms of the § 363 sale it approved; the two are not in tension. The remand order resolved who would decide Suzann's motion to enforce her probate judgment. A ruling about where a dispute may be decided is not a ruling about how the dispute must be decided, **and it is not a prospective surrender of this Court's authority to interpret and enforce its own Sale Orders**. It did not decide, and did not purport to decide, the effect of the Sale Orders, the operation of paragraph E(d) and the reattachment provision, or whether Suzann may take both the proceeds and the Property. The present Motion presents those enforcement questions in a materially different and now concrete posture: CM Capital itself is the movant; Suzann has received the remaining proceeds as "Constructive Trust" distributions; the Probate Court has entered and Suzann has recorded an order affecting CM Capital's Property; and the Palo Pinto court has entered a judgment that, if enforced, would deprive CM Capital of the Property without restoration of its purchase price.

## D. The later state-court orders created a concrete need for enforcement of the Sale Orders.

25. The Response asserts that CM Capital "changed its mind" because it "is not doing well in state court." CM Capital did file and litigate the Palo Pinto action, and the Palo Pinto court entered judgment against it. But the Response identifies no statement, filing, or conduct in that action by which CM Capital waived its rights under § 363(m) or the Sale Orders. To the contrary, CM Capital relied on those Sale Orders as the source of its title throughout the state litigation. Nor did the state-court judgment eliminate this Court's independent and expressly retained authority to interpret and enforce its own Orders. The Probate transcript demonstrates why that enforcement

35254861-9

is now necessary. **<u>In CM Capital's absence</u>**, the Probate Court was told that the Trustee's deeds were void and conditional and then announced that it would "set aside those deeds and clear up the record." [Reply APP 2, 1/9/26 Tr. 28:13-14, 37:9-15, 48:1-25].

26. The Probate Court also acknowledged that it was "not 100% certain" of Michael Ruff's relationship to the companies and that "we don't have someone representing any of these companies appearing here," but nevertheless stated that this Court had indicated that Suzann owned the Properties "and has for a good long while." [Reply APP 2, 1/9/26 Tr. 49:7-16]. The Probate Court's authority to enforce its judgment against the parties before it does not answer whether its enforcement order could bind a nonparty purchaser, cancel intervening federal deeds, or override purchaser rights arising under the Sale Orders. That characterization illustrates why an authoritative interpretation from this Court is now necessary: the federal proceedings established Suzann's pre-sale constructive-trust interest, but this Court did not state that the Trustee's completed deeds were void or that Suzann continuously owned the land notwithstanding the Sale Orders. The present Motion does not ask this Court to sit in appellate review of that ruling. It asks this Court to state authoritatively what its own Sale Orders and the Trustee's deeds mean after state courts, in CM Capital's absence or over its objection, entered orders purporting **<u>to nullify or supersede those federal instruments</u>**.

27. The present conflict did not exist in its current form during the late-2025 hearings. The Probate Court's order "memorializing" Suzann's title was entered January 9, 2026, then recorded against the Property, and the Palo Pinto judgment followed on March 18, 2026. Those intervening orders now create a direct and concrete conflict with CM Capital's asserted rights under the Sale Orders and Trustee's deeds. CM Capital does not ask this Court to review or correct

35254861-9

either state court's reasoning. It asks this Court to determine and enforce the independent federal rights created by its own prior Orders.

**E. The requested relief does not require this Court to review or overrule any state judgment.**

28. Finally, the Response characterizes the Motion as an attempt to "overrule" the state courts and "interfere" with the Eastland appeal. The relevant question, however, is not whether the state judgments cease to exist, but whether Suzann may use them to accomplish conduct this Court's earlier Sale Orders already barred. CM Capital invokes the preexisting, in personam bar-and-estoppel injunction contained in the 2023 Sale Orders and asks this Court to enforce that injunction against a party bound by it. The Motion does not ask this Court to vacate the state judgments, correct their reasoning, or decide whether the state courts properly applied Texas law; that the requested relief may affect what Suzann can do with the state-court orders does not convert the Motion into appellate review of them. CM Capital's asserted right arose from the 2023 Sale Orders **before either state judgment existed** and does not depend on proving that either state court committed legal error. The Motion therefore presents an independent federal enforcement claim rather than a de facto appeal barred by Rooker-Feldman. The Motion further explains why enforcement of the Sale Orders' preexisting injunction and protection or effectuation of this Court's judgments permit relief notwithstanding the Anti-Injunction Act.

**F. Conclusion.**

29. For these reasons, and those stated in the Motion, CM Capital respectfully requests that the Court grant the Motion and enter the requested findings and relief. At minimum, Suzann's one-page Response supplies no basis for summary denial without consideration of the Sale Orders, the purchaser evidence submitted with the Motion and this Reply, and the disputed enforcement issues presented. If the Court is not prepared to grant relief on the written record, CM Capital

respectfully requests the expedited evidentiary hearing sought in the Motion and specific findings of fact and conclusions of law on the grounds for the Court's ruling. If the Court concludes that CM Capital previously consented to another forum, waived enforcement in this Court, or asked this Court to abstain from interpreting its Sale Orders, CM Capital respectfully requests a specific finding identifying the statement, filing, or conduct on which that conclusion rests. Likewise, if the Court declines relief based on jurisdiction, abstention, comity, preclusion, or the merits, CM Capital requests that the Court identify the precise ground and enter specific findings of fact and conclusions of law sufficient for review.

Dated: August 7, 2026

Respectfully submitted,

*/s/ Joyce W. Lindauer*
Joyce W. Lindauer
State Bar No. 21555700
Lindauer & Vaughn
117 S. Dallas Street
Ennis, Texas 75119
Telephone: (972) 503-4033
Facsimile: (972) 503-4034
Email: joyce@joycelindauer.com
*Attorneys for CM Capital Group LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 7, 2026, a true and correct copy of the foregoing document was served via email through the Court's ECF system upon the parties receiving electronic notice in this case.

*/s/ Joyce W. Lindauer*
Joyce W. Lindauer

**APPENDIX**
**TABLE OF CONTENTS**


| | |
|---|---|
| **REPLY APP 1 -** | **Supplemental Declaration of Mark Ruff** |
| **REPLY APP 2 -** | **January 9, 2026 Reporter's Record Excerpts, PR-11-02825-2** |
| **REPLY APP 3 -** | **March 13, 2026 Reporter's Record Excerpts, C52143** |
| **REPLY APP 4 -** | **July 28, 2023 Sale Hearing Excerpts, Dkt. 1232** |
| **REPLY APP 5 -** | **May 8, 2025 Hearing on Motion to Enforce Excerpts, Dkt. 1203** |

# REPLY APP 1

Joyce W. Lindauer
State Bar No. 21555700
Lindauer & Vaughn
117 S. Dallas Street
Ennis, Texas 75119
Telephone: (972) 503-4033
Facsimile: (972) 503-4034
*Attorneys for CM Capital Group LLC*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| CM RESORT LLC *et al*., | § | Case No. 18-43168-elm11 (jointly administered with No. 18-43561 and 18-43562) |
| | § | |
| Debtor. | § | |
| | § | |

# SUPPLEMENTAL DECLARATION OF MARK RUFF IN SUPPORT OF CM CAPITAL GROUP LLC'S REPLY IN SUPPORT OF ITS MOTION TO ADMINISTRATIVELY REOPEN CASES AND TO ENFORCE FINAL SALE ORDERS

I, Mark Ruff, Manager of CM Capital Group LLC, declare as follows:

1. I am over the age of eighteen, of sound mind, and fully competent to make this Declaration. I have personal knowledge of the facts stated herein, and each is true and correct. If called to testify, I could and would testify competently to these facts. I previously executed the Declaration of Mark Ruff filed in support of CM Capital Group LLC's Motion to Administratively Reopen Cases and to Enforce Final Sale Orders (the "Prior Declaration"). This Supplemental Declaration supplements and does not replace the Prior Declaration. I make this Supplemental Declaration to establish additional facts concerning CM Capital's investors and funding, the bidding process and purchase-price provisions, CM Capital's post-closing expenditures, and CM Capital's position concerning interpretation and enforcement of the Sale Orders. Capitalized terms not otherwise defined have the meanings given in the Motion, the Prior Declaration, and the Sale Orders.

2. I am the Manager of CM Capital Group LLC ("CM Capital") and have served in that capacity since 2022. In that role, I participated personally in obtaining the capital used for the purchase, executing CM Capital's bid contracts, participating in the auction, approving the final bids, and closing the transactions. I am familiar with and regularly review CM Capital's governing records, investor and capital-contribution records, bank records, bid contracts, closing records, books and accounting records, and records of expenditures concerning the Property. The statements below are based on my personal participation in these matters and my review of CM Capital's records. I am a resident of Texas and a Lieutenant Colonel in the United States Air Force.

3. CM Capital is a separate limited liability company and was not a party to the Probate Action, the arbitration, or the adversary proceeding in which the disputes between Suzann Ruff, Michael Ruff, and the Debtors were adjudicated. CM Capital was capitalized by twenty-six investors. Based on my personal dealings with those investors and my review of CM Capital's records, those investors include physicians, commercial and military pilots, real-estate developers, entrepreneurs, and public servants. They contributed their own funds to CM Capital for the purpose of acquiring and holding the Property as an investment. CM Capital used investor-contributed money to fund its acquisition of the Property. Michael Ruff is not a member, manager, employee, or owner of CM Capital. Michael Ruff did not contribute any portion of the funds CM Capital used to acquire the Property.

4. In June 2023, before the auction, the Court's Bid Procedures Order required prospective bidders, including CM Capital, to deliver a signed Contract of Sale using the Trustee's prescribed form as a condition to qualifying for the auction. The form language was supplied by the Trustee and was not negotiated by CM Capital. The Bid Procedures Order required a

qualifying bid of at least $4,100,000 for the CM Resort Property and $400,000 for each of the Sundance Lodge and Specfac Group Properties. When I signed CM Capital's three contracts before the auction, they therefore reflected aggregate qualifying bids of $4,900,000. The provisions referring to the Property being conveyed "as is, where is, and with all faults" and to the purchase price being "discounted" were already contained in the Trustee's prescribed form contracts when those qualifying bids were submitted.

5. Competitive bidding increased CM Capital's aggregate purchase price from $4,900,000 to $7,300,002 – an increase of $2,400,002. CM Capital's final winning bids were $6,300,000 for the CM Resort Property, $500,001 for the Specfac Group Property, and $500,001 for the Sundance Lodge Property. At the July 28, 2023 Sale Hearing, the same qualifying-bid Contracts that I had signed in June were completed and executed at those final winning prices through the interlineation and initialing process described in paragraphs 16 through 18 below. The standardized "discounted" and "as is, where is, and with all faults" language was not changed, renegotiated, or recalculated as the aggregate price increased by $2,400,002. No one identified, calculated, or communicated to me any particular reduction in the final auction price attributable to Suzann Ruff's litigation, the pending appeal, the purchase of bare legal title, or a risk that CM Capital's deed would automatically become void or ineffective if she prevailed. Based on my personal participation in the bidding process and my review of CM Capital's records, CM Capital did not request or negotiate any such litigation-specific discount. The final purchase prices were established through competitive bidding at the auction and approved by this Court.

6. I understood section 8.16 of the Trustee's prescribed Contract of Sale as allocating the warranty, representation, investigation, and due-diligence risks concerning the matters listed in that section. Those matters included title warranties other than the title warranty contained in

the required Special Warranty Deed, zoning, taxes, physical and environmental conditions, access, operating history, projections, valuation, governmental approvals, marketability, suitability, construction, materials, and the state of repair of the Property. I understood that CM Capital was accepting those identified risks and limiting its recourse against the Trustee for matters covered by the disclaimer; I understood the "special warranty" to limit the Trustee's warranty obligations and CM Capital's recourse against the Trustee; I did not understand it to reduce or alter the fee-simple estate CM Capital was acquiring.

7. I reviewed the Contract's Permitted Exceptions before authorizing CM Capital to close. Exception 2 recited this Court's judgment denying Suzann Ruff's competing ownership claims and identified her particular District Court appeal by case number. I understood that the appeal remained pending and that the transaction documents disclosed its pendency. I did not understand the listing of that appeal, or section 8.16, to redefine the asset being purchased as bare legal title, reserve ownership of the Property in Suzann Ruff, make CM Capital's deed temporary or automatically defeasible, or provide that CM Capital could lose the Property without restoration of its purchase price. The same prescribed Contract separately required the Trustee at closing to deliver a Special Warranty Deed conveying the Property to CM Capital "in indefeasible fee simple, free and clear of any lien, encumbrance or exception other than the Permitted Exceptions." I understood the Permitted Exceptions to disclose matters subject to which the fee-simple estate would be conveyed. I did not understand any of them to carve out an ownership estate, reserve title in Suzann Ruff, reduce CM Capital's purchase to bare legal title, or make CM Capital's title automatically defeasible.

8. I understood the litigation exceptions to disclose and preserve the identified proceedings. I did not understand them to create or enlarge a Property Interest, create a

reversionary interest, reserve Suzann Ruff's asserted ownership in the Property, or provide that CM Capital's title would disappear automatically upon an appellate ruling. I understood that the post-closing treatment of any interest ultimately established through the adversary proceeding would be governed by paragraph E(d), the reattachment provision, and the bar-and-estoppel provisions of the Sale Orders. Those provisions, together with the complete-transfer, good-faith-purchaser, and § 363(m) protections described in my Prior Declaration, materially affected CM Capital's bids and its decision to close.

9. I testified at the July 28, 2023 Sale Hearing. I understood that Suzann Ruff was asking the Court to reject CM Capital's winning bids, deny CM Capital good-faith-purchaser protection under § 363(m), and award the Properties to the backup bidders. After receiving evidence, the Court overruled all of her objections, found that the sales were arm's-length transactions without collusion, found that CM Capital's bids were the highest and best offers, approved CM Capital's final winning bids, and held that CM Capital was entitled to the good-faith-purchaser protections of § 363(m).

10. I understood and intended CM Capital's final bids to be bids for the defined Property – not for bare legal title, conditional deeds, or a temporary interest that could later disappear. I understood that the purpose and effect of the Court-approved auction and Sale Orders were to produce a final, market-tested sale to a good-faith purchaser, subject to the treatment of disputed interests expressly provided in the Sale Orders. I further understood that, absent a stay of the Sale Orders, the validity of the completed sales would not later be undone based on the outcome of Suzann Ruff's appeal, and that any interest established through that appeal would be treated after closing as the Sale Orders provided – by reattaching to the proceeds rather than remaining enforceable against CM Capital or the Property.

11. I relied on those rulings and protections when I authorized CM Capital to close and satisfy the $7,300,002 purchase price. I would not have authorized CM Capital to close if the transaction documents had stated that CM Capital was acquiring only bare legal title, that the Property could later be taken from CM Capital based on a subsequent recharacterization of what the Trustee had sold, or that CM Capital could be divested of the Property without restoration of its purchase price.

12. A portion of CM Capital's aggregate purchase price was satisfied through the credit bid approved by this Court. Before the auction, CM Capital had used investor-contributed funds to purchase the secured obligation underlying that credit bid. The credit bid therefore represented value for which CM Capital had already paid using its investors' money. CM Capital paid the remaining cash purchase price and closing obligations using investor-contributed funds. The consideration paid for the Property – including both the approved credit bid and the cash paid at closing – was funded by CM Capital and its investors. No portion of the funds used by CM Capital to acquire the secured obligation, submit its bids, or close the transactions came from Suzann Ruff, Michael Ruff, the Debtors, or property belonging to the estates.

13. Since closing on August 21, 2023, CM Capital has continuously possessed, insured, maintained, managed, and paid the ownership costs of the Property. CM Capital also repaired and improved the Property. CM Capital satisfied the purchase price in full. Based on CM Capital's books and accounting records, CM Capital has spent more than $500,000 after closing to preserve, insure, operate, maintain, repair, improve, and carry the Property. These expenditures were made in reliance on CM Capital's ownership under the Sale Orders and Trustee's deeds.

14. Neither the Trustee, the estates, nor Suzann Ruff has returned or offered to return any portion of CM Capital's $7,300,002 purchase price. Nor has anyone reimbursed or offered to

reimburse CM Capital for its substantial post-closing expenditures. If Suzann Ruff succeeds in using the January 9, 2026 Probate Court order or the March 18, 2026 Palo Pinto County judgment to divest CM Capital of the Property, CM Capital will lose the Property notwithstanding its payment of the purchase price and its continuing investment in the Property. CM Capital's twenty-six investors will correspondingly suffer the loss in value of their investments attributable to CM Capital's purchase price and substantial post-closing expenditures, while CM Capital will have received no return of its purchase price or reimbursement of those expenditures.

15. CM Capital has never represented to this Court that this Court should decline to interpret or enforce the Sale Orders. CM Capital has never agreed that interpretation or enforcement of the Sale Orders should be left to another forum in place of this Court, and it has never agreed to refrain from seeking interpretation or enforcement from this Court. The court-approved Bid Procedures provided that Qualified Bidders participating in the auction consented to this Court's core jurisdiction over disputes concerning the construction and enforcement of the contemplated transaction documents. The Trustee's prescribed Contract of Sale similarly provided that any suit or action arising out of the Contract would be subject to this Court's jurisdiction. CM Capital participated in the auction and closed under that framework. In the Palo Pinto litigation, CM Capital relied on the Sale Orders and Trustee's deeds as the source of its title; it did not take the position that this Court lacked authority to interpret or enforce its own Orders. CM Capital has consistently maintained that the Sale Orders remain valid and enforceable and that this Court – the court that entered them – may interpret and enforce them. I never authorized any attorney, representative, or agent of CM Capital to take the position that this Court should decline to interpret or enforce the Sale Orders in favor of another forum. To my knowledge, CM Capital never took that position.

16. At the beginning of the July 28, 2023 Sale Hearing, the Trustee offered the three Contracts that I had signed to qualify CM Capital for the auction as Trustee's Exhibits 27, 28, and 29. Those Contracts still reflected CM Capital's qualifying bids of $4,100,000 for the CM Resort Property and $400,000 for each of the Specfac Group and Sundance Lodge Properties. During my testimony, the Court asked whether those Contracts had been interlineated to state the actual winning bid prices and whether finalized Contracts had been completed and initialed. Trustee's counsel advised the Court that the Trustee had interlineated the Contracts and shared them with CM Capital's counsel but that they had not yet been finalized. Trustee's counsel also represented that the terms remained the same, other than the interlineations necessary to reflect the winning bidder and final transaction.

17. The Court then asked whether I was prepared and authorized to counter-initial with the Trustee the Contracts admitted as Trustee's Exhibits 27, 28, and 29 at the final winning bid prices. I answered that I was. During a recess in the Sale Hearing, CM Capital and the Trustee completed and executed those same Contracts by striking through the qualifying-bid amounts and inserting CM Capital's final winning prices of $6,300,000, $500,001, and $500,001. The Trustee and I signed or initialed the completed Contracts. The parties also added a separate interlineated provision stating that no executory contracts or unexpired leases were being assumed or assigned through the Contracts.

18. After the recess, the completed Contracts were offered and admitted without objection as Trustee's Exhibits 46, 47, and 48. I testified that they were the Contracts I had executed with the Trustee during the recess, that each stated the correct final winning price, and that CM Capital requested that the Court approve them as the operative agreements. Except for the final purchase prices and the separate provision concerning executory contracts and unexpired

leases, the prescribed terms remained unchanged. Those unchanged terms included the definition of the Property, the standardized "discounted" and "as is, where is, and with all faults" provisions, the requirement that the Trustee convey the Property in indefeasible fee simple, and the Permitted Exceptions. No term was added stating that CM Capital was purchasing only bare legal title, that any part of the final price was allocated to bare legal title, or that CM Capital's title would automatically terminate if Suzann Ruff later prevailed in an appeal.

19. The Sale Orders subsequently approved each sale at the final winning price under the corresponding completed Contract attached to that Sale Order as Exhibit B. Those completed Contracts, including the interlineated final winning prices and the signatures or initials approving them, are already in the record as Exhibit B to the Sale Orders included at APP 2, APP 3, and APP 4 to CM Capital's Motion. Attached as Exhibits A, B, and C to this Supplemental Declaration are true and correct excerpts from the pre-auction Contracts admitted at the Sale Hearing as Trustee's Exhibits 27, 28, and 29. Those excerpts show CM Capital's original qualifying bids, my June 2023 execution of the Contracts, and the standardized "discounted" language that was already included in the Trustee's prescribed form before the auction. Comparison of those pre-auction excerpts with the completed Contracts attached to the Sale Orders confirms that the purchase prices were increased to the final winning bids while the standardized provisions discussed above remained unchanged.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 7, 2026.

/s/ Mark Ruff
Mark Ruff
Manager, CM Capital Group LLC

# EXHIBIT
# A

# CONTRACT OF SALE

THIS CONTRACT OF SALE (the "Contract") is made between JOHN DEE SPICER, Chapter 11 Trustee for CM RESORT LLC, a Texas limited liability company, and Debtor, under Case No. 18-43168-elm-11, pending in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division (the "Seller"), and CM Capital Group LLC, a Texas limited liability company, and/or its assigns (the "Purchaser"). In consideration of the agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser agree as follows:

## ARTICLE I.
## Sale of the Property

Subject to the terms and provisions of this Contract, Seller agrees to sell to Purchaser, and Purchaser agrees to purchase from Seller, all of the following property (sometimes referred to herein in the aggregate as the "Property"):

(a) the tracts of land consisting of approximately 1,854.349 acres located off of Farm to Market Road 2692, Gordon, Palo Pinto County, Texas (collectively, the "Land"), being described on **Exhibit "A"**, which is attached hereto and made a part hereof for all purposes, together with all interest, if any, of Seller in (i) strips or gores, if any, between the Land and abutting properties, and (ii) any land lying, in or under the bed of any street, alley, road or right-of-way, opened or proposed, abutting or adjacent to the Land;

(b) all buildings, structures and improvements on the Land, if any (herein referred to as the "Improvements");

(c) all rights, titles and interests of Seller, if any, in and to any oil, gas, hydrocarbons and all other minerals in, on, or under, or that may be produced from the Land;

(d) all of Seller's interest in leases, subleases and rental agreements (written or verbal, now or hereafter in effect, if any) that grant a possessory interest in or that otherwise grant rights with regard to use of all or any portion of the Land or the minerals beneath it;

(e) all rights, titles and interests of Seller in and to any easements, rights-of-way, rights of ingress or egress or other interests in, on, or to, any land, highway, street, road or avenue, open or proposed, in, on, across, in front of, abutting, or adjoining the Land; and

(f) all other rights, privileges and appurtenances owned by Seller and in any way related to the property interests described above in this Article.

All of the Property shall be sold, conveyed and assigned to Purchaser at the Closing free and clear of all liens, claims, encumbrances, and interests pursuant to 11 U.S.C. §363 (f).

## ARTICLE II.
## Earnest Money Deposit

2.1. **Amount of Earnest Money**. Purchaser shall upon their execution of this Contract deposit with the Seller $75,000.00 cash ("Earnest Money Deposit"). If the Purchaser already deposited earnest money for the property in either of Sundance Lodge LLC, Case No. 18-43562-elm11, or Specfac Group LLC, Case No. 18-43161-elm11, Purchaser has satisfied the Earnest Money Deposit under this Contract and same will be noted on the Receipt of Earnest Money Deposit.

## ARTICLE III.
## Purchase Price

The total purchase price for the Property (the "Purchase Price") shall be Four Million One Hundred Thousand AND NO/100 DOLLARS ($ 4,100,000), to be paid to Seller at Closing (as such term is defined in Section 6.1 hereof) in cash or by Purchaser's certified or cashier's check, subject to prorations and other credits provided for in this Contract.

From the Purchase Price the Seller shall satisfy in full the secured claim of Robin Phelan and the secured claims of the appliable taxing authorities for property taxes then due against the Property as of the date of Closing (see Paragraph 6.3).

## ARTICLE IV.

4.1. **Title Commitment**. Purchaser may obtain a commitment for the issuance of a standard form T-1 Texas Owner Policy of Title Insurance, issued through a title company, describing the Land, listing Purchaser as the proposed insured and showing the Purchase Price as the policy amount. The Purchaser's election to obtain a title policy, title report, abstract, or commitment is not a condition to Closing.

4.2 **Title Notices**.

(1) *Statutory Tax Districts*. If the Property is situated in a utility or other statutorily created district providing water, sewer, drainage, or flood control facilities and services, Chapter 49, Texas Water Code, requires Seller to deliver and Purchaser to sign the statutory notice relating to the tax rate, bonded indebtedness, or standby fee of the district prior to final execution of this Contract. Purchaser agrees to prepare for execution any required notices under this provision and deliver them for execution in advance of closing.

(2) *Texas Agricultural Development District*. The Property is not located in a Texas Agricultural Development District. For additional information contact the Texas Department of Agriculture.

(3) *Transfer Fees*. If the Property is subject to a private transfer fee obligation, §5.205, Property Code requires Seller to notify Purchaser as follows: The private transfer fee obligation may be governed by Chapter 5, Subchapter G of the Texas Property Code.

8.16. **Property Conveyed "AS IS". IT IS UNDERSTOOD AND AGREED THAT EXCEPT AS EXPRESSLY PROVIDED IN THIS CONTRACT, SELLER IS NOT MAKING AND SPECIFICALLY DISCLAIMS ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, WITH RESPECT TO THE PROPERTY, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OR REPRESENTATIONS AS TO MATTERS OF TITLE (OTHER THAN SELLER'S WARRANTY OF TITLE SET FORTH IN THE SPECIAL WARRANTY DEED TO BE DELIVERED AT CLOSING), ZONING, TAX CONSEQUENCES, PHYSICAL OR ENVIRONMENTAL CONDITIONS, AVAILABILITY OF ACCESS, INGRESS OR EGRESS, OPERATING HISTORY OR PROJECTIONS, VALUATION, GOVERNMENTAL APPROVALS, GOVERNMENTAL REGULATIONS OR ANY OTHER MATTER OR THING RELATING TO OR AFFECTING THE PROPERTY, INCLUDING, WITHOUT LIMITATION, (i) THE VALUE, CONDITION, MERCHANTABILITY, MARKETABILITY, PROFITABILITY, SUITABILITY OR FITNESS FOR A PARTICULAR USE OR PURPOSE OF THE PROPERTY, (ii) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS INCORPORATED INTO ANY OF THE PROPERTY, AND (iii) THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY. PURCHASER HAS NOT RELIED UPON AND WILL NOT RELY UPON, EITHER DIRECTLY OR INDIRECTLY, ANY REPRESENTATION OR WARRANTY OF SELLER (EXCEPT AS PROVIDED IN THIS CONTRACT) OR ANY AGENT OF SELLER. PURCHASER REPRESENTS THAT IT IS A KNOWLEDGEABLE PURCHASER OF REAL ESTATE AND THAT IT IS RELYING SOLELY ON ITS OWN EXPERTISE AND THAT OF PURCHASER'S CONSULTANTS IN PURCHASING THE PROPERTY. PURCHASER WILL CONDUCT SUCH INSPECTIONS AND INVESTIGATIONS OF THE PROPERTY AS PURCHASER DEEMS NECESSARY, INCLUDING, BUT NOT LIMITED TO, THE PHYSICAL AND ENVIRONMENTAL CONDITIONS THEREOF, AND SHALL RELY UPON SAME. UPON CLOSING, PURCHASER SHALL ASSUME THE RISK THAT ADVERSE MATTERS, INCLUDING, BUT NOT LIMITED TO, ADVERSE PHYSICAL AND ENVIRONMENTAL CONDITIONS, MAY NOT HAVE BEEN REVEALED BY PURCHASER'S INSPECTIONS AND INVESTIGATIONS. PURCHASER ACKNOWLEDGES AND AGREES THAT UPON CLOSING, SELLER SHALL SELL AND CONVEY TO PURCHASER AND PURCHASER SHALL ACCEPT THE PROPERTY "AS IS, WHERE IS," WITH ALL FAULTS. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT THERE ARE NO ORAL AGREEMENTS, WARRANTIES OR REPRESENTATIONS, COLLATERAL TO OR AFFECTING THE PROPERTY BY SELLER, ANY AGENT OF SELLER OR ANY THIRD PARTY. THE TERMS AND CONDITIONS OF THIS PARAGRAPH SHALL EXPRESSLY SURVIVE THE CLOSING, NOT MERGE WITH THE PROVISIONS OF ANY CLOSING DOCUMENTS AND SHALL BE INCORPORATED INTO THE SPECIAL WARRANTY DEED. SELLER IS NOT LIABLE OR BOUND IN ANY MANNER BY ANY ORAL OR WRITTEN STATEMENTS, REPRESENTATIONS, OR INFORMATION PERTAINING TO THE PROPERTY FURNISHED BY ANY REAL ESTATE BROKER, AGENT, EMPLOYEE, SERVANT OR OTHER PERSON, UNLESS THE SAME ARE SPECIFICALLY SET FORTH OR REFERRED TO HEREIN. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT THE PROVISIONS OF THIS SECTION 8.16 WERE A MATERIAL**

SELLER:

______________________________________
JOHN DEE SPICER, Trustee for CM RESORT LLC, Debtor, Bankruptcy Case No. 18-43168-elm11, in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division

Executed by Seller on _____________, 2023

PURCHASER:

CM Capital Group LLC,
a Texas limited liability company

By: ______________________
Mark Ruff, Manager

Executed by Purchaser on June 28, 2023

# Exhibit "A"
# Description of the Property

**Property Owned by CM Resort LLC:**

BEING a 1,854.349 acre tract of land situated in the Burleson County School Land Survey, Abstract No. 28, the John A. Fortune Survey, Abstract No. 183, the Isaac Ryan Survey, Abstract No. 387, the T. & N.O. RR Co. Survey, Abstract No. 694, the A.B. & M. Survey No. 1, Abstract No. 17, the E. P. Cowan Survey, Abstract No. 1148, the A. B. & M. Survey No. 5, Abstract No. 21, the J. R. Jones, Abstract No. 1178 and the A. B. & M. Survey No. 7, Abstract No. 11, Palo Pinto County, Texas; said tract being all of that tract of land described in Special Warranty Deed to CM Resort LLC recorded in Volume 2043, Page 66 of the Deed Records of Palo Pinto County, Texas; said 1,854.349 acre tract being more particularly described as follows:

BEGINNING, at a 1/2-inch iron rod with "PACHECO KOCH" cap set for the northeast corner of said CM Resort LLC tract and the southernmost southeast corner of 7R Ranch, Phase 3, an addition to Palo Pinto County, Texas according to the plat recorded in Volume 9, Page 94, Side 660, as revised by amending plat of 7R Ranch, Phase 4, Lot 1, Block F and Common Area B, an addition to Palo Pinto, Texas according to the plat recorded in Volume 9, Page 233, Slide 800, both of said Map Records of Palo Pinto, Texas; said point being in the west line of that tract of land described in Deed to Texas Parks and Wildlife Department recorded in Volume 2104, Page 583 of the said Deed Records;

THENCE, South 01 degrees, 57 minutes, 55 seconds East, along an east line of said CM Resort LLC tract and the west line of said Texas Parks and Wildlife tract, a distance of 2,604.15 feet to a 1/2-inch iron rod found in the north line of a tract of land described in Warranty Deed to Arenisca Holdings LLC recorded in Volume 2015, Page 533 of said Deed Records; said point being the most easterly southeast corner of said CM Resort LLC tract and the southwest corner of said Texas Parks and Wildlife tract;

THENCE, South 89 degrees, 27 minutes, 39 seconds West, along a south line of said CM Resort LLC tract and the said north line of Arenisca Holdings LLC tract, a distance of 5,205.31 feet to a nail in stone mound found for an interior corner of said CM Resort LLC tract and the northwest corner of said Arenisca Holdings LLC tract;

THENCE, South 00 degrees, 26 minutes, 33 seconds East, along a east line of said CM Resort LLC tract and the west line of said Arenisca Holdings LLC tract, a distance of 1,759.48 feet to a 1/2-inch iron rod found for corner; said point being the most southerly southeast corner of said CM Resort LLC tract and the northeast corner of a tract of land described in General Warranty Deed to Forrad Capital LLC. and Palo Vista Holdings LP as recorded in Volume 1733, Page 129 of said Deed Records;

THENCE, South 89 degrees, 28 minutes, 16 seconds West, departing the said west line of said Arenisca Holdings LLC tract, along the southernmost south line of said CM Resort LLC tract and the north line of said Forrad Capital LLC tract and Palo Vista Holdings, LP tract, a distance of 8,114.30 feet to a wood fence corner post found for corner in the east line of a tract of land described in Deed to Kinkade Kenneth Harold Heirs recorded in Volume 2069, Page 619 of the

together with all improvements attached thereto (collectively, the "Property"), subject only to the items described in the attached Exhibit "B".

TO HAVE AND TO HOLD the Property, together with all and singular the rights and appurtenances thereto in anywise belonging, unto Grantee, and Grantee's successors and assigns forever; and Grantor does hereby bind himself, his successors and assigns, but only in his capacity as CHAPTER 11 TRUSTEE for CM RESORT LLC, a Texas limited liability company, the Debtor, to WARRANT AND FOREVER DEFEND, all and singular, the Property unto Grantee, and Grantee's successors and assigns, against every person whomsoever lawfully claiming or to claim the Property or any part thereof, by, through, or under Grantor, but not otherwise.

Grantee by its acceptance hereof, does hereby assume and agree to pay any and all *ad valorem* taxes and special assessments pertaining to the Property for calendar year 2023 and subsequent years, including subsequent taxes and assessments by any taxing authority for prior years due to change in land usage or ownership.

EXCEPT AS OTHERWISE SET FORTH IN THE CONTRACT OF SALE BETWEEN GRANTOR AND GRANTEE, EFFECTIVE ___________, 2023 (THE "CONTRACT"), GRANTOR IS NOT MAKING AND HAS NOT MADE, AND GRANTOR HEREBY SPECIFICALLY DISCLAIMS, ANY WARRANTY OR REPRESENTATION OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, WITH RESPECT TO THE PROPERTY, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OR REPRESENTATIONS AS TO MATTERS OF TITLE (OTHER THAN GRANTOR'S WARRANTY OF TITLE CONTAINED IN THIS SPECIAL WARRANTY DEED), ZONING, TAX CONSEQUENCES, PHYSICAL OR ENVIRONMENTAL CONDITIONS, AVAILABILITY OF ACCESS, INGRESS OR EGRESS, OPERATING HISTORY OR PROJECTIONS, VALUATION, GOVERNMENTAL APPROVALS, GOVERNMENTAL REGULATIONS OR ANY OTHER MATTER OR THING RELATING TO OR AFFECTING THE PROPERTY, INCLUDING, WITHOUT LIMITATION, (i) THE VALUE, CONDITION, MERCHANTABILITY, MARKETABILITY, PROFITABILITY, SUITABILITY OR FITNESS FOR A PARTICULAR USE OR PURPOSE OF THE PROPERTY, (ii) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS INCORPORATED INTO ANY OF THE PROPERTY AND (iii) THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY. GRANTEE ACKNOWLEDGES AND REPRESENTS THAT IT HAS NOT RELIED UPON AND WILL NOT RELY UPON, EITHER DIRECTLY OR INDIRECTLY, ANY REPRESENTATION OR WARRANTY OF GRANTOR OR ANY AGENT OF GRANTOR (EXCEPT AS PROVIDED IN THE CONTRACT). GRANTEE FURTHER ACKNOWLEDGES AND REPRESENTS THAT IT IS A SOPHISTICATED PURCHASER OF REAL ESTATE AND THAT IT IS RELYING SOLELY ON ITS OWN EXPERTISE AND THAT OF GRANTEE'S CONSULTANTS IN PURCHASING THE PROPERTY. GRANTEE REPRESENTS THAT IT HAS CONDUCTED SUCH INSPECTIONS AND INVESTIGATIONS OF THE PROPERTY AS GRANTEE HAS DEEMED NECESSARY, INCLUDING, BUT NOT LIMITED TO THE PHYSICAL AND ENVIRONMENTAL CONDITIONS THEREOF AND SHALL RELY UPON SAME. GRANTEE HEREBY ACKNOWLEDGES THAT IT ASSUMES THE RISK THAT ADVERSE MATTERS, INCLUDING, BUT NOT LIMITED TO, ADVERSE PHYSICAL AND ENVIRONMENTAL CONDITIONS, MAY NOT HAVE BEEN REVEALED BY GRANTEE'S INSPECTIONS AND INVESTIGATIONS. GRANTEE ACCEPTS THE PROPERTY, AND

ACKNOWLEDGES THAT THE CONVEYANCE OF THE PROPERTY TO GRANTEE IS MADE BY GRANTOR, ON AN "AS IS, WHERE IS, AND WITH ALL FAULTS" BASIS. GRANTEE FURTHER ACKNOWLEDGES AND AGREES THAT THERE ARE NO ORAL AGREEMENTS, WARRANTIES OR REPRESENTATIONS, COLLATERAL TO OR AFFECTING THE PROPERTY BY THE GRANTOR, ANY AGENT OF THE GRANTOR OR ANY THIRD PARTY. GRANTEE FURTHER ACKNOWLEDGES AND REPRESENTS THAT GRANTOR SHALL NOT BE LIABLE OR BOUND IN ANY MANNER BY ANY ORAL OR WRITTEN STATEMENTS, REPRESENTATIONS, OR INFORMATION PERTAINING TO THE PROPERTY FURNISHED BY ANY REAL ESTATE BROKER, AGENT, EMPLOYEE, SERVANT OR OTHER PERSON. GRANTEE FURTHER ACKNOWLEDGES AND AGREES THAT THE PURCHASE PRICE FOR THE PROPERTY IS A DISCOUNTED PRICE BASED UPON THE PROPERTY BEING CONVEYED "AS IS, WHERE IS, AND WITH ALL FAULTS" AS PROVIDED HEREIN AND IN SECTION 8.16 OF THE CONTRACT, AND THAT GRANTOR WOULD NOT HAVE AGREED TO SUCH PURCHASE PRICE BUT FOR THE PROVISIONS OF SECTION 8.16 OF THE CONTRACT.

GRANTEE'S AGREEMENT TO, AND ACKNOWLEDGMENT OF, THE VARIOUS MATTERS SPECIFIED IN THIS SPECIAL WARRANTY DEED SHALL BE CONCLUSIVELY EVIDENCED BY GRANTEE'S ACCEPTANCE HEREOF.

EXECUTED this _____ day of ____________, 2023.

GRANTOR:

[Exhibit Counterpart; Do Not Sign]

_______________________________________
JOHN DEE SPICER, Trustee for CM RESORT LLC, Debtor, Bankruptcy Case No. 18-43168-elm11, in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division

ACCEPTED AND AGREED TO
this ___ day of ____, 2023.

GRANTEE:

____________________________,
a __________________________

[Exhibit Counterpart; Do Not Sign]
By:____________________________
Printed name: ____________________
Title: ____________________________

# EXHIBIT
# B

# CONTRACT OF SALE

THIS CONTRACT OF SALE (the "Contract") is made between JOHN DEE SPICER, Chapter 11 Trustee for SPECFAC GROUP LLC, a Texas limited liability company, and Debtor, under Case No. 18-43561-elm-11, pending in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division (the "Seller"), and CM Capital Group LLC, a Texas limited liability company, and/or its assigns (the "Purchaser"). In consideration of the agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser agree as follows:

## ARTICLE I.
## Sale of the Property

Subject to the terms and provisions of this Contract, Seller agrees to sell to Purchaser, and Purchaser agrees to purchase from Seller, all of the following property (sometimes referred to herein in the aggregate as the "Property"):

(a) the tracts of land consisting of approximately 469 acres located off of Farm to Market Road 2692, Gordon, Palo Pinto County, Texas (collectively, the "Land"), being described on **Exhibit "A"**, which is attached hereto and made a part hereof for all purposes, together with all interest, if any, of Seller in (i) strips or gores, if any, between the Land and abutting properties, and (ii) any land lying, in or under the bed of any street, alley, road or right-of-way, opened or proposed, abutting or adjacent to the Land;

(b) all buildings, structures and improvements on the Land, if any (herein referred to as the "Improvements");

(c) all rights, titles and interests of Seller, if any, in and to any oil, gas, hydrocarbons and all other minerals in, on, or under, or that may be produced from the Land;

(d) all of Seller's interest in leases, subleases and rental agreements (written or verbal, now or hereafter in effect, if any) that grant a possessory interest in or that otherwise grant rights with regard to use of all or any portion of the Land or the minerals beneath it;

(e) all rights, titles and interests of Seller in and to any easements, rights-of-way, rights of ingress or egress or other interests in, on, or to, any land, highway, street, road or avenue, open or proposed, in, on, across, in front of, abutting, or adjoining the Land; and

(f) all other rights, privileges and appurtenances owned by Seller and in any way related to the property interests described above in this Article.

All of the Property shall be sold, conveyed and assigned to Purchaser at the Closing free and clear of all liens, claims, encumbrances, and interests pursuant to 11 U.S.C. §363 (f).

**ARTICLE II.**
**Earnest Money Deposit**

2.1. **Amount of Earnest Money**. Purchaser shall upon their execution of this Contract deposit with the Seller $75,000.00 cash ("Earnest Money Deposit"). If the Purchaser already deposited earnest money for the property in either of Sundance Lodge LLC, Case No. 18-43562-elm11, or CM Resort LLC, Case No. 18-43168-elm11, Purchaser has satisfied the Earnest Money Deposit under this Contract and same will be noted on the Receipt of Earnest Money Deposit.

**ARTICLE III.**
**Purchase Price**

The total purchase price for the Property (the "Purchase Price") shall be Four Hundred Thousand AND NO/100 DOLLARS ($ 400,000 ), to be paid to Seller at Closing (as such term is defined in Section 6.1 hereof) in cash or by Purchaser's certified or cashier's check, subject to prorations and other credits provided for in this Contract.

From the Purchase Price the Seller shall satisfy in full the secured claim of Robin Phelan and the secured claims of the appliable taxing authorities for property taxes then due against the Property as of the date of Closing (see Paragraph 6.3).

**ARTICLE IV.**

4.1. **Title Commitment**. Purchaser may obtain a commitment for the issuance of a standard form T-1 Texas Owner Policy of Title Insurance, issued through a title company, describing the Land, listing Purchaser as the proposed insured and showing the Purchase Price as the policy amount. The Purchaser's election to obtain a title policy, title report, abstract, or commitment is not a condition to Closing.

4.2 **Title Notices**.

(1) *Statutory Tax Districts*. If the Property is situated in a utility or other statutorily created district providing water, sewer, drainage, or flood control facilities and services, Chapter 49, Texas Water Code, requires Seller to deliver and Purchaser to sign the statutory notice relating to the tax rate, bonded indebtedness, or standby fee of the district prior to final execution of this Contract. Purchaser agrees to prepare for execution any required notices under this provision and deliver them for execution in advance of closing.

(2) *Texas Agricultural Development District*. The Property is not located in a Texas Agricultural Development District. For additional information contact the Texas Department of Agriculture.

(3) *Transfer Fees*. If the Property is subject to a private transfer fee obligation, §5.205, Property Code requires Seller to notify Purchaser as follows: The private transfer fee obligation may be governed by Chapter 5, Subchapter G of the Texas Property Code.

8.16. **Property Conveyed "AS IS". IT IS UNDERSTOOD AND AGREED THAT EXCEPT AS EXPRESSLY PROVIDED IN THIS CONTRACT, SELLER IS NOT MAKING AND SPECIFICALLY DISCLAIMS ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, WITH RESPECT TO THE PROPERTY, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OR REPRESENTATIONS AS TO MATTERS OF TITLE (OTHER THAN SELLER'S WARRANTY OF TITLE SET FORTH IN THE SPECIAL WARRANTY DEED TO BE DELIVERED AT CLOSING), ZONING, TAX CONSEQUENCES, PHYSICAL OR ENVIRONMENTAL CONDITIONS, AVAILABILITY OF ACCESS, INGRESS OR EGRESS, OPERATING HISTORY OR PROJECTIONS, VALUATION, GOVERNMENTAL APPROVALS, GOVERNMENTAL REGULATIONS OR ANY OTHER MATTER OR THING RELATING TO OR AFFECTING THE PROPERTY, INCLUDING, WITHOUT LIMITATION, (i) THE VALUE, CONDITION, MERCHANTABILITY, MARKETABILITY, PROFITABILITY, SUITABILITY OR FITNESS FOR A PARTICULAR USE OR PURPOSE OF THE PROPERTY, (ii) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS INCORPORATED INTO ANY OF THE PROPERTY, AND (iii) THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY. PURCHASER HAS NOT RELIED UPON AND WILL NOT RELY UPON, EITHER DIRECTLY OR INDIRECTLY, ANY REPRESENTATION OR WARRANTY OF SELLER (EXCEPT AS PROVIDED IN THIS CONTRACT) OR ANY AGENT OF SELLER. PURCHASER REPRESENTS THAT IT IS A KNOWLEDGEABLE PURCHASER OF REAL ESTATE AND THAT IT IS RELYING SOLELY ON ITS OWN EXPERTISE AND THAT OF PURCHASER'S CONSULTANTS IN PURCHASING THE PROPERTY. PURCHASER WILL CONDUCT SUCH INSPECTIONS AND INVESTIGATIONS OF THE PROPERTY AS PURCHASER DEEMS NECESSARY, INCLUDING, BUT NOT LIMITED TO, THE PHYSICAL AND ENVIRONMENTAL CONDITIONS THEREOF, AND SHALL RELY UPON SAME. UPON CLOSING, PURCHASER SHALL ASSUME THE RISK THAT ADVERSE MATTERS, INCLUDING, BUT NOT LIMITED TO, ADVERSE PHYSICAL AND ENVIRONMENTAL CONDITIONS, MAY NOT HAVE BEEN REVEALED BY PURCHASER'S INSPECTIONS AND INVESTIGATIONS. PURCHASER ACKNOWLEDGES AND AGREES THAT UPON CLOSING, SELLER SHALL SELL AND CONVEY TO PURCHASER AND PURCHASER SHALL ACCEPT THE PROPERTY "AS IS, WHERE IS," WITH ALL FAULTS. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT THERE ARE NO ORAL AGREEMENTS, WARRANTIES OR REPRESENTATIONS, COLLATERAL TO OR AFFECTING THE PROPERTY BY SELLER, ANY AGENT OF SELLER OR ANY THIRD PARTY. THE TERMS AND CONDITIONS OF THIS PARAGRAPH SHALL EXPRESSLY SURVIVE THE CLOSING, NOT MERGE WITH THE PROVISIONS OF ANY CLOSING DOCUMENTS AND SHALL BE INCORPORATED INTO THE SPECIAL WARRANTY DEED. SELLER IS NOT LIABLE OR BOUND IN ANY MANNER BY ANY ORAL OR WRITTEN STATEMENTS, REPRESENTATIONS, OR INFORMATION PERTAINING TO THE PROPERTY FURNISHED BY ANY REAL ESTATE BROKER, AGENT, EMPLOYEE, SERVANT OR OTHER PERSON, UNLESS THE SAME ARE SPECIFICALLY SET FORTH OR REFERRED TO HEREIN. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT THE PROVISIONS OF THIS SECTION 8.16 WERE A MATERIAL**

______________________________________
JOHN DEE SPICER, Trustee for SPECFAC GROUP LLC, Debtor, Bankruptcy Case No. 18-43561-elm11, in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division

Executed by Seller on _____________, 2023

PURCHASER:

CM Capital Group LLC,
a Texas limited liability company

By: ______________________
Mark Ruff, Manager

Executed by Purchaser on June 28, 2023

**Exhibit "A"**
**Description of the Property**

**Property owned by Specfac Group LLC:**

Acres: 1.932, 7-R RANCH PHASE 4 COMMON AREA B G#70000-04-000F0-000-00-0
(1.932 ACRES, ARTHUR L. RUFF REC. CENTER) BEING COMMON AREA "B", 7-R RANCH, PHASE 4, A SUBDIVISION IN PALO PINTO COUNTY, TEXAS, ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 9, PAGE 233, SLIDE 800, PLAT RECORDS OF PALO PINTO COUNTY, TEXAS.

Acres: 16.729, 7-R RANCH PHASE 2 COMMON AREA F G#70000-02-000A0-0F0-00-0
(16.729 ACRES) BEING COMMON AREA "F", 7-R RANCH, PHASE 2, A SUBDIVISION IN PALO PINTO COUNTY, TEXAS, ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 9, PAGE 92, SLIDE 658, PLAT RECORDS OF PALO PINTO COUNTY, TEXAS.

Acres: 4.005, 7-R RANCH PHASE 3 COMMON AREA B G#70000-03-00000-0B0-00-0
Acres: 118.777, 7-R RANCH PHASE 3 COMMON AREA C G#70000-03-00000-0C0-00-0
(4.005 ACRES AND 118.777 ACRES, RESPECTIVELY) BEING COMMON AREA "B" AND COMMON AREA "C", 7-R RANCH, PHASE 3, A SUBDIVISION IN PALO PINTO COUNTY, TEXAS, ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 9, PAGE 94, SLIDE 660, PLAT RECORDS OF PALO PINTO COUNTY, TEXAS.

Acres: 10.937, 7-R RANCH PHASE 4 COMMON AREA A
(10.937 ACRES) BEING COMMON AREA "A", 7-R RANCH, PHASE 4, A SUBDIVISION IN PALO PINTO COUNTY, TEXAS, ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 9, PAGE 233, SLIDE 800 PLAT RECORDS OF PALO PINTO COUNTY, TEXAS.

Acres: 2.036, 7-R RANCH PHASE 5 COMMON AREA A & B
(2.036 ACRES) BEING COMMON AREA "A" AND COMMON AREA "B", 7-R RANCH, PHASE 5, A SUBDIVISION IN PALO PINTO COUNTY, TEXAS, ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 9, PAGE 168, SLIDE 734, PLAT RECORDS OF PALO PINTO COUNTY, TEXAS.

Acres: 63.228, 7-R RANCH PHASE 1 BLK A COMMON AREAS-A B & C
Acres: 1.000, 7-R RANCH PHASE 1 PART OF COMMON AREA A
(63.228 ACRES AND 1.000-CLUBHOUSE) BEING COMMON AREA "A", COMMON AREA "B" AND COMMON AREA "C", 7-R RANCH, PHASE 1, A SUBDIVISION IN PALO PINTO COUNTY, TEXAS, ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 9, PAGE 23, SLIDE 595, PLAT RECORDS OF PALO PINTO COUNTY, TEXAS.

Acres: 46.997, 7-R RANCH PHASE 2 COMMON AREA B-R & D-R
(46.997 ACRES) BEING COMMON AREAS "B-R" AND "D-4", 7-R RANCH, PHASE 2, A SUBDIVISION IN PALO PINTO COUNTY, TEXAS, ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 9, PAGE 114, SLIDE 680, PLAT RECORDS OF PALO

together with all improvements attached thereto (collectively, the "Property"), subject only to the items described in the attached Exhibit "B".

TO HAVE AND TO HOLD the Property, together with all and singular the rights and appurtenances thereto in anywise belonging, unto Grantee, and Grantee's successors and assigns forever; and Grantor does hereby bind himself, his successors and assigns, but only in his capacity as CHAPTER 11 TRUSTEE for SPECFAC GROUP LLC, a Texas limited liability company, the Debtor, to WARRANT AND FOREVER DEFEND, all and singular, the Property unto Grantee, and Grantee's successors and assigns, against every person whomsoever lawfully claiming or to claim the Property or any part thereof, by, through, or under Grantor, but not otherwise.

Grantee by its acceptance hereof, does hereby assume and agree to pay any and all *ad valorem* taxes and special assessments pertaining to the Property for calendar year 2023 and subsequent years, including subsequent taxes and assessments by any taxing authority for prior years due to change in land usage or ownership.

EXCEPT AS OTHERWISE SET FORTH IN THE CONTRACT OF SALE BETWEEN GRANTOR AND GRANTEE, EFFECTIVE ___________, 2023 (THE "CONTRACT"), GRANTOR IS NOT MAKING AND HAS NOT MADE, AND GRANTOR HEREBY SPECIFICALLY DISCLAIMS, ANY WARRANTY OR REPRESENTATION OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, WITH RESPECT TO THE PROPERTY, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OR REPRESENTATIONS AS TO MATTERS OF TITLE (OTHER THAN GRANTOR'S WARRANTY OF TITLE CONTAINED IN THIS SPECIAL WARRANTY DEED), ZONING, TAX CONSEQUENCES, PHYSICAL OR ENVIRONMENTAL CONDITIONS, AVAILABILITY OF ACCESS, INGRESS OR EGRESS, OPERATING HISTORY OR PROJECTIONS, VALUATION, GOVERNMENTAL APPROVALS, GOVERNMENTAL REGULATIONS OR ANY OTHER MATTER OR THING RELATING TO OR AFFECTING THE PROPERTY, INCLUDING, WITHOUT LIMITATION, (i) THE VALUE, CONDITION, MERCHANTABILITY, MARKETABILITY, PROFITABILITY, SUITABILITY OR FITNESS FOR A PARTICULAR USE OR PURPOSE OF THE PROPERTY, (ii) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS INCORPORATED INTO ANY OF THE PROPERTY AND (iii) THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY. GRANTEE ACKNOWLEDGES AND REPRESENTS THAT IT HAS NOT RELIED UPON AND WILL NOT RELY UPON, EITHER DIRECTLY OR INDIRECTLY, ANY REPRESENTATION OR WARRANTY OF GRANTOR OR ANY AGENT OF GRANTOR (EXCEPT AS PROVIDED IN THE CONTRACT). GRANTEE FURTHER ACKNOWLEDGES AND REPRESENTS THAT IT IS A SOPHISTICATED PURCHASER OF REAL ESTATE AND THAT IT IS RELYING SOLELY ON ITS OWN EXPERTISE AND THAT OF GRANTEE'S CONSULTANTS IN PURCHASING THE PROPERTY. GRANTEE REPRESENTS THAT IT HAS CONDUCTED SUCH INSPECTIONS AND INVESTIGATIONS OF THE PROPERTY AS GRANTEE HAS DEEMED NECESSARY, INCLUDING, BUT NOT LIMITED TO THE PHYSICAL AND ENVIRONMENTAL CONDITIONS THEREOF AND SHALL RELY UPON SAME. GRANTEE HEREBY ACKNOWLEDGES THAT IT ASSUMES THE RISK THAT ADVERSE MATTERS, INCLUDING, BUT NOT LIMITED TO, ADVERSE PHYSICAL AND ENVIRONMENTAL CONDITIONS, MAY NOT HAVE BEEN REVEALED BY GRANTEE'S INSPECTIONS AND INVESTIGATIONS. GRANTEE ACCEPTS THE PROPERTY, AND

ACKNOWLEDGES THAT THE CONVEYANCE OF THE PROPERTY TO GRANTEE IS MADE BY GRANTOR, ON AN "AS IS, WHERE IS, AND WITH ALL FAULTS" BASIS. GRANTEE FURTHER ACKNOWLEDGES AND AGREES THAT THERE ARE NO ORAL AGREEMENTS, WARRANTIES OR REPRESENTATIONS, COLLATERAL TO OR AFFECTING THE PROPERTY BY THE GRANTOR, ANY AGENT OF THE GRANTOR OR ANY THIRD PARTY. GRANTEE FURTHER ACKNOWLEDGES AND REPRESENTS THAT GRANTOR SHALL NOT BE LIABLE OR BOUND IN ANY MANNER BY ANY ORAL OR WRITTEN STATEMENTS, REPRESENTATIONS, OR INFORMATION PERTAINING TO THE PROPERTY FURNISHED BY ANY REAL ESTATE BROKER, AGENT, EMPLOYEE, SERVANT OR OTHER PERSON. GRANTEE FURTHER ACKNOWLEDGES AND AGREES THAT THE PURCHASE PRICE FOR THE PROPERTY IS A DISCOUNTED PRICE BASED UPON THE PROPERTY BEING CONVEYED "AS IS, WHERE IS, AND WITH ALL FAULTS" AS PROVIDED HEREIN AND IN SECTION 8.16 OF THE CONTRACT, AND THAT GRANTOR WOULD NOT HAVE AGREED TO SUCH PURCHASE PRICE BUT FOR THE PROVISIONS OF SECTION 8.16 OF THE CONTRACT.

GRANTEE'S AGREEMENT TO, AND ACKNOWLEDGMENT OF, THE VARIOUS MATTERS SPECIFIED IN THIS SPECIAL WARRANTY DEED SHALL BE CONCLUSIVELY EVIDENCED BY GRANTEE'S ACCEPTANCE HEREOF.

EXECUTED this _____ day of ____________, 2023.

GRANTOR:

[Exhibit Counterpart; Do Not Sign]

_______________________________________
JOHN DEE SPICER, Trustee for SPECFAC GROUP LLC, Debtor, Bankruptcy Case No. 18-43561-elm11, in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division

ACCEPTED AND AGREED TO
this ___ day of ____, 2023.

GRANTEE:

____________________________,
a __________________________

[Exhibit Counterpart; Do Not Sign]
By:_____________________________
Printed name: ____________________
Title: ____________________________

# EXHIBIT
# C

# CONTRACT OF SALE

THIS CONTRACT OF SALE (the "Contract") is made between JOHN DEE SPICER, Chapter 11 Trustee for SUNDANCE LODGE LLC, a Texas limited liability company, and Debtor, under Case No. 18-43562-elm-11, pending in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division (the "Seller"), and CM Capital Group LLC , a Texas limited liability company, and/or its assigns (the "Purchaser"). In consideration of the agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser agree as follows:

## ARTICLE I.
## Sale of the Property

Subject to the terms and provisions of this Contract, Seller agrees to sell to Purchaser, and Purchaser agrees to purchase from Seller, all of the following property (sometimes referred to herein in the aggregate as the "Property"):

(a) the tracts of land consisting of approximately 104 acres located off of Farm to Market Road 2692, Gordon, Palo Pinto County, Texas (collectively, the "Land"), being described on **Exhibit "A"**, which is attached hereto and made a part hereof for all purposes, together with all interest, if any, of Seller in (i) strips or gores, if any, between the Land and abutting properties, and (ii) any land lying, in or under the bed of any street, alley, road or right-of-way, opened or proposed, abutting or adjacent to the Land;

(b) all buildings, structures and improvements on the Land, if any (herein referred to as the "Improvements");

(c) all rights, titles and interests of Seller, if any, in and to any oil, gas, hydrocarbons and all other minerals in, on, or under, or that may be produced from the Land;

(d) all of Seller's interest in leases, subleases and rental agreements (written or verbal, now or hereafter in effect, if any) that grant a possessory interest in or that otherwise grant rights with regard to use of all or any portion of the Land or the minerals beneath it;

(e) all rights, titles and interests of Seller in and to any easements, rights-of-way, rights of ingress or egress or other interests in, on, or to, any land, highway, street, road or avenue, open or proposed, in, on, across, in front of, abutting, or adjoining the Land; and

(f) all other rights, privileges and appurtenances owned by Seller and in any way related to the property interests described above in this Article.

All of the Property shall be sold, conveyed and assigned to Purchaser at the Closing free and clear of all liens, claims, encumbrances, and interests pursuant to 11 U.S.C. §363 (f).

## ARTICLE II.
## Earnest Money Deposit

2.1. **Amount of Earnest Money**. Purchaser shall upon their execution of this Contract deposit with the Seller $75,000.00 cash ("Earnest Money Deposit"). If the Purchaser already deposited earnest money for the property in either of CM Resort LLC, Case No. 18-43568-elm11, or Specfac Group LLC, Case No. 18-43161-elm11, Purchaser has satisfied the Earnest Money Deposit under this Contract and same will be noted on the Receipt of Earnest Money Deposit.

## ARTICLE III.
## Purchase Price

The total purchase price for the Property (the "Purchase Price") shall be Four Hundred Thousand AND NO/100 DOLLARS ($ 400,000 ), to be paid to Seller at Closing (as such term is defined in Section 6.1 hereof) in cash or by Purchaser's certified or cashier's check, subject to prorations and other credits provided for in this Contract.

From the Purchase Price the Seller shall satisfy in full the secured claim of Robin Phelan and the secured claims of the appliable taxing authorities for property taxes then due against the Property as of the date of Closing (see Paragraph 6.3).

## ARTICLE IV.

4.1. **Title Commitment**. Purchaser may obtain a commitment for the issuance of a standard form T-1 Texas Owner Policy of Title Insurance, issued through a title company, describing the Land, listing Purchaser as the proposed insured and showing the Purchase Price as the policy amount. The Purchaser's election to obtain a title policy, title report, abstract, or commitment is not a condition to Closing.

4.2 **Title Notices**.

(1) *Statutory Tax Districts*. If the Property is situated in a utility or other statutorily created district providing water, sewer, drainage, or flood control facilities and services, Chapter 49, Texas Water Code, requires Seller to deliver and Purchaser to sign the statutory notice relating to the tax rate, bonded indebtedness, or standby fee of the district prior to final execution of this Contract. Purchaser agrees to prepare for execution any required notices under this provision and deliver them for execution in advance of closing.

(2) *Texas Agricultural Development District*. The Property is not located in a Texas Agricultural Development District. For additional information contact the Texas Department of Agriculture.

(3) *Transfer Fees*. If the Property is subject to a private transfer fee obligation, §5.205, Property Code requires Seller to notify Purchaser as follows: The private transfer fee obligation may be governed by Chapter 5, Subchapter G of the Texas Property Code.

Case 18-43168-elm11 Doc 91-23 Filed 07/25/23 Entered 07/25/23 16:14:57 Desc
Main Document Page 49 of 99

8.16. **Property Conveyed "AS IS". IT IS UNDERSTOOD AND AGREED THAT EXCEPT AS EXPRESSLY PROVIDED IN THIS CONTRACT, SELLER IS NOT MAKING AND SPECIFICALLY DISCLAIMS ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, WITH RESPECT TO THE PROPERTY, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OR REPRESENTATIONS AS TO MATTERS OF TITLE (OTHER THAN SELLER'S WARRANTY OF TITLE SET FORTH IN THE SPECIAL WARRANTY DEED TO BE DELIVERED AT CLOSING), ZONING, TAX CONSEQUENCES, PHYSICAL OR ENVIRONMENTAL CONDITIONS, AVAILABILITY OF ACCESS, INGRESS OR EGRESS, OPERATING HISTORY OR PROJECTIONS, VALUATION, GOVERNMENTAL APPROVALS, GOVERNMENTAL REGULATIONS OR ANY OTHER MATTER OR THING RELATING TO OR AFFECTING THE PROPERTY, INCLUDING, WITHOUT LIMITATION, (i) THE VALUE, CONDITION, MERCHANTABILITY, MARKETABILITY, PROFITABILITY, SUITABILITY OR FITNESS FOR A PARTICULAR USE OR PURPOSE OF THE PROPERTY, (ii) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS INCORPORATED INTO ANY OF THE PROPERTY, AND (iii) THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY. PURCHASER HAS NOT RELIED UPON AND WILL NOT RELY UPON, EITHER DIRECTLY OR INDIRECTLY, ANY REPRESENTATION OR WARRANTY OF SELLER (EXCEPT AS PROVIDED IN THIS CONTRACT) OR ANY AGENT OF SELLER. PURCHASER REPRESENTS THAT IT IS A KNOWLEDGEABLE PURCHASER OF REAL ESTATE AND THAT IT IS RELYING SOLELY ON ITS OWN EXPERTISE AND THAT OF PURCHASER'S CONSULTANTS IN PURCHASING THE PROPERTY. PURCHASER WILL CONDUCT SUCH INSPECTIONS AND INVESTIGATIONS OF THE PROPERTY AS PURCHASER DEEMS NECESSARY, INCLUDING, BUT NOT LIMITED TO, THE PHYSICAL AND ENVIRONMENTAL CONDITIONS THEREOF, AND SHALL RELY UPON SAME. UPON CLOSING, PURCHASER SHALL ASSUME THE RISK THAT ADVERSE MATTERS, INCLUDING, BUT NOT LIMITED TO, ADVERSE PHYSICAL AND ENVIRONMENTAL CONDITIONS, MAY NOT HAVE BEEN REVEALED BY PURCHASER'S INSPECTIONS AND INVESTIGATIONS. PURCHASER ACKNOWLEDGES AND AGREES THAT UPON CLOSING, SELLER SHALL SELL AND CONVEY TO PURCHASER AND PURCHASER SHALL ACCEPT THE PROPERTY "AS IS, WHERE IS," WITH ALL FAULTS. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT THERE ARE NO ORAL AGREEMENTS, WARRANTIES OR REPRESENTATIONS, COLLATERAL TO OR AFFECTING THE PROPERTY BY SELLER, ANY AGENT OF SELLER OR ANY THIRD PARTY. THE TERMS AND CONDITIONS OF THIS PARAGRAPH SHALL EXPRESSLY SURVIVE THE CLOSING, NOT MERGE WITH THE PROVISIONS OF ANY CLOSING DOCUMENTS AND SHALL BE INCORPORATED INTO THE SPECIAL WARRANTY DEED. SELLER IS NOT LIABLE OR BOUND IN ANY MANNER BY ANY ORAL OR WRITTEN STATEMENTS, REPRESENTATIONS, OR INFORMATION PERTAINING TO THE PROPERTY FURNISHED BY ANY REAL ESTATE BROKER, AGENT, EMPLOYEE, SERVANT OR OTHER PERSON, UNLESS THE SAME ARE SPECIFICALLY SET FORTH OR REFERRED TO HEREIN. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT THE PROVISIONS OF THIS SECTION 8.16 WERE A MATERIAL**

SELLER:

________________________________________
JOHN DEE SPICER, Trustee for SUNDANCE LODGE LLC, Debtor, Bankruptcy Case No. 18-43562-elm11, in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division

Executed by Seller on _____________, 2023

PURCHASER:

CM Capital Group LLC,
a Texas limited liability company

By: [signature]
Mark Ruff, Manager

Executed by Purchaser on June 28, 2023

**Exhibit "A"**
**Description of the Property**

**<u>Property Owned by Sundance Lodge LLC</u>:**

Acres: 5.775, 7-R RANCH PHASE 1 BLK I LOT 11 G#70000-01-000I0-011-00-0
(5.775 ACRES) BEING LOT 11, BLOCK I, 7-R RANCH, PHASE 1, A SUBDIVISION IN PALO PINTO COUNTY, TEXAS, ACCORDING TO REPLAT OF PLAT OF RECORD IN VOLUME 9, PAGE 23, SLIDE 595, OF THE PLAT RECORDS, PALO PINTO COUNTY, TEXAS.

Acres: 5.407, 7-R RANCH PHASE 1 BLK A LOT 1 G#70000-01-000A0-001-00-0
(5.407 ACRES) BEING LOT 1, BLOCK A, 7-R RANCH, PHASE 1, A SUBDIVISION IN PALO PINTO COUNTY, TEXAS, ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 9, PAGE 1, SLIDE 573, OF THE MAP/PLAT RECORDS OF PALO PINTO COUNTY, TEXAS.

Acres: 6.811, 7-R RANCH PHASE 1 BLK K LOT 1R G#70000-01-000K0-001-0R-0
(6.811 ACRES) BEING LOT 1R, BLOCK K, 7-R RANCH, PHASE 1, A SUBDIVISION IN PALO PINTO COUNTY, TEXAS, ACCORDING TO REPLAT OF PLAT OF RECORD IN VOLUME 9, PAGE 23, SLIDE 595, OF THE PLAT RECORDS, PALO PINTO COUNTY, TEXAS.

Acres: 5.187, 7-R RANCH PHASE 1 BLK K LOT 4 G#70000-01-000K0-004-00-0
(5.187 ACRES) BEING LOT 4, BLOCK K, 7-R RANCH, PHASE 1, A SUBDIVISION IN PALO PINTO COUNTY, TEXAS, ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 9, PAGE 1, SLIDE 573, OF THE MAP/PLAT RECORDS OF PALO PINTO COUNTY, TEXAS.

Acres: 1.512, 7-R RANCH PHASE 1A BLK A LOT 3A G#7001A-00-000A0-003-A0-0
Acres: 1.736, 7-R RANCH PHASE 1A BLK A LOT 3B G#7001A-00-000A0-003-B0-0
Acres: 1.562, 7-R RANCH PHASE 1A BLK A LOT 3C G#7001A-00-000A0-003-C0-0
Acres: 0.774, 7-R RANCH PHASE 1A BLK A LOT 3D G#7001A-00-000A0-003-D0-0
Acres: 0.552, 7-R RANCH PHASE 1A BLK A LOT 3E G#7001A-00-000A0-003-E0-0
(1.512 ACRES, 1.736 ACRES, 1.562 ACRES, 0.774 ACRES AND 0.552 ACRES, RESPECTIVELY) BEING LOT 3A, LOT 3B, LOT 3C, LOT 30 AND LOT 3E, BLOCK A, 7-R RANCH, PHASE 1A, A SUBDIVISION IN PALO PINTO COUNTY, TEXAS, ACCORDING TO THE PLAT THEREOF RECORDED IN RECORDED IN VOLUME 8, PAGE 51, PLAT RECORDS OF PALO PINTO COUNTY, TEXAS; FINAL AMENDED PLAT RECORDED IN VOLUME 9, PAGE 211, PLAT RECORDS OF PALO PINTO COUNTY, TEXAS.

Acres: 13.651, 7-R RANCH PHASE 2 BLK A LOT 1 G#70000-02-000A0-001-00-0
Acres: 9.256, 7-R RANCH PHASE 2 BLK A LOT 2 G#70000-02-000A0-002-00-0
(13.651 ACRES AND 9.256 ACRES, RESPECTIVELY) BEING LOT 1 AND LOT 2, BLOCK A, 7-R RANCH, PHASE 2, A SUBDIVISION IN PALO PINTO COUNTY, TEXAS, ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 9, PAGE 49, SLIDE 615, PLAT RECORDS OF PALO PINTO COUNTY, TEXAS.

together with all improvements attached thereto (collectively, the "Property"), subject only to the items described in the attached Exhibit "B".

TO HAVE AND TO HOLD the Property, together with all and singular the rights and appurtenances thereto in anywise belonging, unto Grantee, and Grantee's successors and assigns forever; and Grantor does hereby bind himself, his successors and assigns, but only in his capacity as CHAPTER 11 TRUSTEE for SUNDANCE LODGE LLC, a Texas limited liability company, the Debtor, to WARRANT AND FOREVER DEFEND, all and singular, the Property unto Grantee, and Grantee's successors and assigns, against every person whomsoever lawfully claiming or to claim the Property or any part thereof, by, through, or under Grantor, but not otherwise.

Grantee by its acceptance hereof, does hereby assume and agree to pay any and all *ad valorem* taxes and special assessments pertaining to the Property for calendar year 2023 and subsequent years, including subsequent taxes and assessments by any taxing authority for prior years due to change in land usage or ownership.

EXCEPT AS OTHERWISE SET FORTH IN THE CONTRACT OF SALE BETWEEN GRANTOR AND GRANTEE, EFFECTIVE ___________, 2023 (THE "CONTRACT"), GRANTOR IS NOT MAKING AND HAS NOT MADE, AND GRANTOR HEREBY SPECIFICALLY DISCLAIMS, ANY WARRANTY OR REPRESENTATION OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, WITH RESPECT TO THE PROPERTY, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OR REPRESENTATIONS AS TO MATTERS OF TITLE (OTHER THAN GRANTOR'S WARRANTY OF TITLE CONTAINED IN THIS SPECIAL WARRANTY DEED), ZONING, TAX CONSEQUENCES, PHYSICAL OR ENVIRONMENTAL CONDITIONS, AVAILABILITY OF ACCESS, INGRESS OR EGRESS, OPERATING HISTORY OR PROJECTIONS, VALUATION, GOVERNMENTAL APPROVALS, GOVERNMENTAL REGULATIONS OR ANY OTHER MATTER OR THING RELATING TO OR AFFECTING THE PROPERTY, INCLUDING, WITHOUT LIMITATION, (i) THE VALUE, CONDITION, MERCHANTABILITY, MARKETABILITY, PROFITABILITY, SUITABILITY OR FITNESS FOR A PARTICULAR USE OR PURPOSE OF THE PROPERTY, (ii) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS INCORPORATED INTO ANY OF THE PROPERTY AND (iii) THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY. GRANTEE ACKNOWLEDGES AND REPRESENTS THAT IT HAS NOT RELIED UPON AND WILL NOT RELY UPON, EITHER DIRECTLY OR INDIRECTLY, ANY REPRESENTATION OR WARRANTY OF GRANTOR OR ANY AGENT OF GRANTOR (EXCEPT AS PROVIDED IN THE CONTRACT). GRANTEE FURTHER ACKNOWLEDGES AND REPRESENTS THAT IT IS A SOPHISTICATED PURCHASER OF REAL ESTATE AND THAT IT IS RELYING SOLELY ON ITS OWN EXPERTISE AND THAT OF GRANTEE'S CONSULTANTS IN PURCHASING THE PROPERTY. GRANTEE REPRESENTS THAT IT HAS CONDUCTED SUCH INSPECTIONS AND INVESTIGATIONS OF THE PROPERTY AS GRANTEE HAS DEEMED NECESSARY, INCLUDING, BUT NOT LIMITED TO THE PHYSICAL AND ENVIRONMENTAL CONDITIONS THEREOF AND SHALL RELY UPON SAME. GRANTEE HEREBY ACKNOWLEDGES THAT IT ASSUMES THE RISK THAT ADVERSE MATTERS, INCLUDING, BUT NOT LIMITED TO, ADVERSE PHYSICAL AND ENVIRONMENTAL CONDITIONS, MAY NOT HAVE BEEN REVEALED BY GRANTEE'S

INSPECTIONS AND INVESTIGATIONS. GRANTEE ACCEPTS THE PROPERTY, AND ACKNOWLEDGES THAT THE CONVEYANCE OF THE PROPERTY TO GRANTEE IS MADE BY GRANTOR, ON AN "AS IS, WHERE IS, AND WITH ALL FAULTS" BASIS. GRANTEE FURTHER ACKNOWLEDGES AND AGREES THAT THERE ARE NO ORAL AGREEMENTS, WARRANTIES OR REPRESENTATIONS, COLLATERAL TO OR AFFECTING THE PROPERTY BY THE GRANTOR, ANY AGENT OF THE GRANTOR OR ANY THIRD PARTY. GRANTEE FURTHER ACKNOWLEDGES AND REPRESENTS THAT GRANTOR SHALL NOT BE LIABLE OR BOUND IN ANY MANNER BY ANY ORAL OR WRITTEN STATEMENTS, REPRESENTATIONS, OR INFORMATION PERTAINING TO THE PROPERTY FURNISHED BY ANY REAL ESTATE BROKER, AGENT, EMPLOYEE, SERVANT OR OTHER PERSON. GRANTEE FURTHER ACKNOWLEDGES AND AGREES THAT THE PURCHASE PRICE FOR THE PROPERTY IS A DISCOUNTED PRICE BASED UPON THE PROPERTY BEING CONVEYED "AS IS, WHERE IS, AND WITH ALL FAULTS" AS PROVIDED HEREIN AND IN SECTION 8.16 OF THE CONTRACT, AND THAT GRANTOR WOULD NOT HAVE AGREED TO SUCH PURCHASE PRICE BUT FOR THE PROVISIONS OF SECTION 8.16 OF THE CONTRACT.

GRANTEE'S AGREEMENT TO, AND ACKNOWLEDGMENT OF, THE VARIOUS MATTERS SPECIFIED IN THIS SPECIAL WARRANTY DEED SHALL BE CONCLUSIVELY EVIDENCED BY GRANTEE'S ACCEPTANCE HEREOF.

EXECUTED this _____ day of ____________, 2023.

GRANTOR:

[Exhibit Counterpart; Do Not Sign]

_______________________________________
JOHN DEE SPICER, Trustee for SUNDANCE LODGE LLC, Debtor, Bankruptcy Case No. 18-43562-elm11, in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division

ACCEPTED AND AGREED TO
this ___ day of ____, 2023.

GRANTEE:

____________________________,
a __________________________

[Exhibit Counterpart; Do Not Sign]
By:_____________________________
Printed name: ____________________
Title: ____________________________

# REPLY APP 2

REPORTER'S RECORD

VOLUME 1 OF 1 VOLUMES

TRIAL COURT CAUSE NO. PR-11-02825-2

| | | |
|---|---|---|
| IN THE MATTER | § | IN PROBATE NO. 2 |
| OF THE | § | OF |
| RUFF MANAGEMENT TRUST | § | DALLAS COUNTY, TEXAS |

*************************************

EMERGENCY MOTION TO STAY ENFORCEMENT

AND RECORDATION PENDING REVIEW

*************************************

On the 9th day of January, 2026, the following proceedings came on to be heard in the above-entitled and -numbered cause before the Honorable Polly Spencer, sitting by assignment, held in Dallas, Dallas County, Texas;

Proceedings reported stenographically in realtime by machine shorthand.

A P P E A R A N C E S

FOR THE PLAINTIFF:

RANDAL MATHIS
SBOT NO. 13194300
MARK DONHEISER
SBOT NO. 05974800
Mathis & Donheiser, P.C.
1412 Main St, Suite 1100
Dallas, TX 75202
PHONE: (214)728-0690
PHONE: (214) 682-3649
EMAIL: Rmathis@mathisdonheiser.com
EMAIL: Markdonheiser@gmail.com

D. BRADLEY KIZZIA
SBOT NO. 11547550
Kizzia Johnson PLLC
1910 Pacific Ave Ste 13000
Dallas, TX 75201-4503
PHONE: (214) 451-0164

# I N D E X

## VOLUME 1

## HEARING ON MERITS


| JANUARY 9, 2026 | Page | Vol. |
|---|---|---|
| Announcements.................................... | 4 | 1 |
| Opening Statement by Mr. Mathis................. | 4 | 1 |
| Court's ruling.................................. | 48 | 1 |
| Adjournment..................................... | 50 | 1 |
| Court Reporter's Certificate.................... | 51 | 1 |


## PLAINTIFF'S EXHIBIT INDEX

| NO. | DESCRIPTION | OFD | ADMTD | VOL |
|---|---|---|---|---|

~ None ~

## DEFENDANT'S EXHIBIT INDEX

| NO. | DESCRIPTION | OFD | ADMTD | VOL |
|---|---|---|---|---|

~ None ~

bankruptcy court in Forth Worth.

And then he gave notice of the purported removal to you in this case. And that in turn resulted yesterday morning because this all just happened in the last 30 hours.

I wrote to Judge Morris in the bankruptcy court who no longer has jurisdiction over any of this. I wrote to him, explained the situation. I sent you a copy of that letter. That letter was called to the judge's attention.

And I assume he had his regular docket during the day. But late yesterday afternoon, about close to 5:00, his deputy sent me a note, which I have sent to everybody, saying that an order had been entered and it was online and we could find it online, which we immediately did and sent it to you. And it's not just a one-liner order as you know; it was an explanation. And Judge Morris entered an order of immediate remand to you for -- for you to handle this today.

So this issue of who has jurisdiction, who doesn't have jurisdiction, I think, is completely resolved by that order; there never was an issue. But at least insofar as Mike had raised an objection to it. I think all of this is just Mr. Ruff trying to create something to complain about on appeal because he knows

And Mr. Petrocchi paused a minute and said, yes.

And that was one of the things, I think was pointed out in Judge Morris's order last time, agreement. Was it in that order? It was something here recently where he commented about Mike is not a party to that bankruptcy, you know. It's technically all these entities and then the trustee and Suzy Ruff. Mike himself is not a party; his brother is not a party. And yet they tried to control everything and show up and you know, whatever.

So I asked the sheriff -- he said, well, but if you go to the deed records, these three entities are the names on the deeds. The deeds from the bankruptcy sale, those are void but the deeds right now, this is what this reads. And I said, well, yeah, but the 5th Circuit ruling means the beneficial ownership is Suzy, and so it's her property. And he said, Well, I need something that says specifically those partials, and you have the 5th Circuit ruling and the amended judgment in bankruptcy court belonged to Suzy Ruff. And then I'll have that order, you can file it in the records but you'll have that order that you can take and I can forcibly remove Mike Ruff if it comes to that. I don't think the man's ever going to leave until the sheriff escorts him off.

enabled by some law firms that were involved in it and so it's a big deal.

So -- but for purposes of today, it's the three parcels; the 1800, the 4-500 and then the 100.

THE COURT: So at all that went into the bankruptcy proceeding were these three pieces of property, correct?

MR. MATHIS: Correct, correct.

THE COURT: So and then Ms. Ruff has gotten the proceeds that were paid in connection with the sales of these properties which I think occurred in July of '23 or something like that.

MR. MATHIS: It was not in connection with the sale of the property. It was in connection with the sale of the conditional deeds, the legal title.

THE COURT: -- Right.

MR. MATHIS: -- which is a huge difference that Judge Morris was pointing out to them when he did it.

THE COURT: And those deeds were clearly conditioned on paying the ad valorem taxes and the appeal that Suzy Ruff --

MR. MATHIS: -- Right. The taxes were paid and then conditioned on the appeals, and so yes.

THE COURT: But, whatever it is, CM Resort

Management, they've not -- someone as a representative of them has not come forward into this proceeding, have they?

MR. MATHIS: No.

THE REPORTER: What -- did you say no, I'm sorry.

MR. MATHIS: I said no.

THE REPORTER: Thank you.

MR. MATHIS: Other than Mike, I will say I suspect we will -- those people will never appear anywhere. There's a huge problem. We don't believe that this bankruptcy's auction's sale of the legal title, you know, conditioned on the appeal. You see, the result of the 5th Circuit is the ruling that beneficial ownership of property, the 1800 acres and the other two parcels never belonged to the three LLCs. And therefore there was nothing to sell.

THE COURT: Now she always owned the beneficiary title.

MR. MATHIS: She always owned it. But if somebody wanted to --

THE REPORTER: I'm sorry. I didn't hear you.

THE COURT: I'm sorry. I said she always owned the beneficiary title.

THE COURT: Those were the special warranty deeds --

MR. MATHIS: Yes.

THE COURT: -- that were assigned on the 21st of August of '23.

MR. MATHIS: That's correct.

Yes, they're all dated the same day incidentally. And the sales orders are all dated August 4, '23.

THE COURT: Okay, so these deeds are the special warranty deeds that are the subject of three court orders from the bankruptcy court in Fort Worth. One of these orders to sell covered the real property that's referred to as 104 acres located off of Farm to Market Road 2692 Gordon Palo Pinto County, Texas and that is the subject of the banks -- bankruptcy court orders trustee's motion for authority to sell. And appears to be entered in that proceeding which I think is Case Number 18-43-168-ELM 11 and perhaps is document 1008 filed August the 4th of '23.

MR. MATHIS: Yes.

All of the bankruptcy related documents so to speak, have printed across the top a computer generated thing that shows the bankruptcy court number, Cause number and the date and the document number. And

then every document is given a different number.

THE COURT: Well, it appears that the document number is the same on each.

MR. MATHIS: I would -- I didn't look but I wouldn't be surprised because it was all done at the same time. In other words the document number -- yeah, 1006 just reflects -- it was all filed as one document on August 4, of 2000.

THE COURT: The documents I'm looking at have what is -- it's DOC-1008.

MR. MATHIS: Okay, right. You're -- I stand corrected. They're numbered 1006, 1007, and 1008, and they're all attached to our proposed order.

MR. DONHEISER: The deeds are attached to your motion.

MR. MATHIS: Yeah. The deeds are attached to our proposed order. The sales orders were attached to our motion with judicial notice plus our trustee.

THE COURT: All right, the document number 1008 that I referenced earlier was the 104 acres. The document that is 1007 is the sales information, and the copy of the deed, the special warranty deed that covers the 469 acres located off Farm to Market Road 2692, Gordon Palo Pinto County, Texas and the document in that bankruptcy cause number that's document 1006, covers the

trustee's ordered sale and the special warranty deed for the 1,854.349 acres located off of Farm to Market Road 2692 Gordon Palo Pinto County, Texas and those deeds and that property are the subject of the 5th Circuit's ruling indicating that the -- while the legal title may have passed to these entities, the underlying equitable title was in Suzy Ruff's. And therefore it would be appropriate to set aside those deeds and clear up the record, the title record on those properties and the orders. And the deeds that were issued were all special warranty deeds subject to some conditions including the payment of the ad valorem taxes and the appeals that Ms. Ruff had filed in the bankruptcy court which resulted in the reversal of the rulings from the bankruptcy court, and the district court in Dallas and the 5th Circuit reversed that and remanded it to the bankruptcy court to issue that.

I would take note of all that and order that the real property records be cleared by listing those three pieces of property as belonging to Suzann Ruff.

MR. MATHIS: Thank you, Your Honor. We submitted a proposed order and extra copy of that order. If they're -- you remember the clerk, Mr. Warren requires that the order come to him directly from you,

not me. I sure would like to walk out today though with a signed conformed copy so that I can get it to Palo Pinto; if I can approach and give you a second one.

THE COURT: And I think it's inherent in this, but as we discussed earlier, I did make a decision to proceed with this hearing. As I indicated, I'm sorry Mr. Ruff is feeling unwell, but there's a procedure to cover that if you're unable to attend which would be a sworn motion for continuance.

As I've indicated, I'm not 100% certain I understand what his relationship is to this. So we don't have someone representing any of these companies appearing here. Anyway, the bankruptcy court has responded to the mandate out of the 5th Circuit to reverse this indicating that Suzann Ruff owns these pieces of property anyway, and has for a good long while; that inherently means Mr. Ruff's plea to the jurisdiction in his motion to dismiss is denied, but that's also written in this order.

MR. MATHIS: All right. All right. Thank you very much, Your Honor.

THE COURT: Okay. And then, let me -- Oh, I see that you have all that information here. I was going to be sure that we had the trustee information --

MR. MATHIS: Yes.

# REPORTER'S CERTIFICATE

THE STATE OF TEXAS )
COUNTY OF DALLAS )

I, Jennifer Collins-Gilley, Deputy Court Reporter in and for Probate No. 2, of Dallas County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and -numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $375 and was paid by Michael Ruff.

WITNESS MY OFFICIAL HAND this the 25th of February, 2026.

/S/ Jennifer Collins-Gilley____________
JENNIFER COLLINS-GILLEY, Texas CSR 8749
CSR Expiration Date: 11/30/2027
Deputy Court Reporter
Probate No. 2 District Court
Dallas County, Texas
Dallas, Dallas, Texas
Jenncol84@gmail.com

# REPLY APP 3

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUME
TRIAL COURT CAUSE NO. C52143
APPELLATE CASE NO. 11-26-00082-CV

| | | |
|---|---|---|
| CM CAPITAL GROUP, LLC, | ) | IN THE DISTRICT COURT |
| Plaintiff, | ) | |
| VS. | ) | 29TH JUDICIAL DISTRICT |
| SUZANN RUFF, | ) | |
| Defendant | ) | PALO PINTO COUNTY, TEXAS |

**MOTION FOR SUMMARY JUDGMENT**

On the 13th day of March, 2026, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Vicki L. Menard, Senior District Judge Presiding, held in Palo Pinto, Palo Pinto County, Texas.

Proceedings reported by computerized stenotype machine.

**APPEARANCES**

MR. DONAL RAY 'DON' SCHMIDT JR.
SBOT NO. 00798486
Attorney at Law
The Schmidt Firm, PLLC
P.O. Box 370
Stephenville, Texas 76401-0005
Telephone: (214) 236-1363

MS. LESLIE RITCHIE ROBNETT
SBOT NO. 24065986
The Schmidt Firm, PLLC
Attorney at Law
P.O. Box 470271
Fort Worth, Texas 76147-0271
Telephone: (512) 204-3583

ATTORNEYS FOR THE PLAINTIFF

MR. RANDAL "RANDY" MATHIS
SBOT NO. 13194300
MR. MARK DONHEISER
SBOT NO. 05974800
Attorneys at Law
Mathis & Donheiser, P.C.
1412 Main Street, Suite 1100
Dallas, Texas 75202-4006
Telephone: (214) 303-1919
Fax: (214) 303-0399

ATTORNEYS FOR THE DEFENDANT

# I N D E X

(MOTION FOR SUMMARY JUDGMENT)

PAGE

MARCH 13, 2026

Proceedings begin.............................. 4
Defendants' Motion for Summary Judgment........ 5
Mr. Mathis's introductory remarks.............. 5
Mr. Donheiser presents motion.................. 18
Ms. Ritchie Robnett's objections............... 27
Mr. Schmidt's argument......................... 32
Mr. Donheiser's response....................... 58
Mr. Mathis's additional response............... 62
Mr. Schmidt's rebuttal......................... 68
Mr. Donheiser's rebuttal....................... 72
Mr. Schmidt's objection........................ 74
Mr. Donheiser's response....................... 76
The Court takes matter under advisement........ 77
Proceedings adjourned.......................... 77
Court Reporter's Certificate................... 78

the appeal was unsuccessful. It made a bet and lost. It bought a lottery ticket, lost, but now still wants the prize.

Now, CM Capital filed this lawsuit in this court and not a motion before Judge Morris. Why is that? Judge Morris has continuing jurisdiction over his orders. The reason is simple. Judge Morris doesn't have jurisdiction. CM Capital is not a debtor. Suzy Ruff is not a debtor. The debtors have no more interest in this case.

And that's just not my opinion; that's Judge Morris' opinion. He agreed that he does not have to decide these issues. And this is a direct quote, "thank God." It's Exhibit 7 at 28. He agreed with Suzy and with CM Capital, because before Judge Morris, they were saying he doesn't have jurisdiction.

He agreed with them -- with us, both of us that he doesn't have jurisdiction. That's Exhibit 4 at 9. And he re-emphasized that in his Order of Remand, which is our Exhibit 9.

While our motions pending before Judge Spencer might remove the case to Bankruptcy Court -- this 2011 case he tried to remove early this year, and immediately -- the next day, I think -- Judge Morris remanded it saying: I don't want this.

Now, they want to say this was all dicta, but the 10-31 transcript before you is not dicta. It is a ruling. There's no evidence there. It is Judge Morris reading to the parties his ruling.

Bankruptcy Courts often do that rather than write it out. That is not dicta. That is part of -- that is an essential part of his ruling, that the free-and-clear language that they're relying on was subject to the appeal.

And we never said that the Fifth Circuit said it was moot. We said the effect of the Fifth Circuit ruling is that these deeds are moot because they are subject to the appeal.

It's even in the deed, Your Honor. I think it's Trustee 5. It says: This deed to CM Capital is subject to the appeal. Why is that in the deed? Because it's no good if Suzy wins the appeal. That's what Judge Morris said.

The case -- the one case they cite, yes, you can attack a 363 sale if it's not conditioned. This one was conditioned. It expressly -- and that's not my word; that's Judge Morris' word in the order -- is expressly subject to the appeal.

It's also in the deed. It's also in the contract for sale. It is subject to the appeal,

STATE OF TEXAS )
COUNTY OF PALO PINTO )

I, Elizabeth Bourquin, CSR, Official Court Reporter in and for the 29th District Court of Palo Pinto County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $728.00 and was paid by CM Capital Group, LLC .

WITNESS MY OFFICIAL HAND this the 21st day of April, 2026.

/s/Elizabeth Bourquin

Elizabeth Bourquin, Texas CSR #5819
Expiration Date: 7/31/26
Official Court Reporter, 29th District Court
Palo Pinto County, Texas
P.O. Box 187
Palo Pinto, Texas 76484
(940) 659-1694

# REPLY APP 4

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| In Re: | **Case No. 18-43168-elm-11** *Jointly Administered* |
| CM RESORT, LLC, et al., | Fort Worth, Texas July 28, 2023 9:30 a.m. |
| Debtors. | MOTION TO SELL PROPERTY (922) MOTION TO SELL PROPERTY (923) MOTION TO SELL PROPERTY (924) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE EDWARD L. MORRIS,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

| | |
|---|---|
| For John Dee Spicer, Trustee: | Steven Thomas Holmes<br>Chuck Hendricks<br>CAVAZOS HENDRICKS POIROT, P.C.<br>900 Jackson Street, Suite 570<br>Founders Square<br>Dallas, TX 75202<br>(214) 573-7305 |
| For the MAR Living Trust and CM Capital: | Joyce W. Lindauer<br>JOYCE W. LINDAUER ATTORNEY, PLLC<br>1412 Main Street, Suite 500<br>Dallas, TX 75202<br>(972) 503-4033 |
| For Suzann Ruff: | Dennis Oliver Olson<br>DENNIS OLSON, ATTORNEY AT LAW<br>1412 Main Street, Suite 2600<br>Dallas, TX 75202<br>(214) 460-7179 |
| For Suzann Ruff: | Randal Gilbert Mathis<br>MATHIS & DONHEISER, P.C.<br>1412 Main Street, Suite 2600<br>Dallas, TX 75202<br>(214) 661-8915 |

Case 18-43168-elm11 Doc 1343 Filed 08/26/25 Entered 08/26/25 18:14:26 Desc
Main Document Page 2 of 129



Recorded by: Shelley Warren
UNITED STATES BANKRUPTCY COURT
501 W. 10th Street
Fort Worth, TX 76102
(817) 333-6005

Transcribed by: Kathy Rehling
311 Paradise Cove
Shady Shores, TX 76208
(972) 786-3063

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

FORT WORTH, TEXAS - JULY 28, 2023 - 9:32 A.M.

THE CLERK: All rise.

THE COURT: All right. Please be seated.

All right. Good morning, everybody. We are on the July 28, 2023, 9:30 a.m. docket. We have the CM Resort, LLC and affiliated debtors cases, jointly administered under Case 18-43168.

Let me go ahead and start by taking appearances in the case. Mr. Hendricks?

MR. HENDRICKS: Good morning, Your Honor. Chuck Hendricks and Steve Holmes here with the Trustee, John Dee Spicer, --

THE COURT: Okay.

MR. HENDRICKS: -- for the Trustee.

THE COURT: Good morning. Ms. Lindauer?

MS. LINDAUER: Good morning, Your Honor. Joyce Lindauer here on behalf of MAR Living Trust and CM Capital. Thank you.

THE COURT: All right. Good morning to you. Mr. Olson?

MR. OLSON: Good morning, Your Honor. Dennis Olson and Randal Mathis for Suzann Ruff. And we will sit at the other table opposite the Trustee, but we are not aligned with the people in the audience.

THE COURT: Okay. All right. Do we have anybody on

County, the CM Resort property; is that right?
A That is correct.
Q And turn to Exhibit 28, please. Is this the contract that you signed on behalf of CM Capital Group to purchase the 469 acres in Palo Pinto County owned by Specfac Group?
A That is correct.
Q And the next exhibit, 29, is this the contract that you signed on behalf of CM Capital Group to purchase the 104 acres in Palo Pinto County currently owned by Sundance Lodge?
A That is correct.
Q And do you understand that the Trustee was relying upon your execution of that agreement at the auction as evidence of your commitment to close the sale?
A That is correct.
Q And that the Court and the Trustee and all parties here are relying upon your representation that you remain committed to closing according to those terms?
A That is correct.
Q Okay. Back at the auction on July 20th at the offices of Cavazos Hendricks Poirot, who else was present --

THE COURT: Can I just real quick, --

MR. HOLMES: Yes, sir.

THE COURT: -- just for my own benefit? Have you all, after the auction, interlineated the contracts or what have you to identify the actual winning bid prices in the

contracts? In other words, do we have finalized contracts that are all done and initialed?

THE WITNESS: I don't -- well, after -- I mean, at the office, yes. And they are an exhibit, I believe, that was filed.

MR. HOLMES: I believe I can clarify that for the Court.

THE COURT: Okay. All right.

BY MR. HOLMES:

Q Let me ask you this question.

A Sure.

Q Other than the three contracts we just looked at, have you signed any other contracts for the purchase of the property -- those properties from the Trustee?

A Yes. The day -- once we were the winning bid.

Q Well, wasn't that just a verification, --

A Oh, sorry. Verification.

Q -- rather than a contract?

A Okay. I'm sorry.

MR. HOLMES: And so I'll represent to the Court, Your Honor, that the Trustee has interlineated those contracts and shared them with counsel for CM Capital, but we have not finalized that contract. The terms, however, are the same, other than interlineating the necessary elements. There's no substantive changes to reflect the winning bidder.

THE COURT: Okay.

BY MR. HOLMES:

Q At the auction on July 20th, --

THE COURT: I guess let me close the loop on this, though. Are you prepared and authorized to effectively counter-initial with the Trustee the contracts that have been introduced into evidence as Exhibits 27, 28, and 29, with the concluding winning bid prices?

THE WITNESS: If I understand your question correctly, Your Honor, the answer is yes. But of course, I would need to speak with my counsel before entering anything.

THE COURT: Okay.

MR. HOLMES: Let me try and close the loop, Your Honor, if I could.

BY MR. HOLMES:

Q Mr. Ruff, could you turn to Exhibit No. 4?

A I am at Exhibit No. 4.

Q Do you recognize this document?

A I do.

Q Is this one of the declarations that you signed at my office at the conclusion of the auction?

A It is.

Q Could you turn to Paragraph 5 of Trustee's Exhibit 4?

A Yes.

Q And it says: I understand my offer, according to the

terms of my signed PSA, and the winning bid price of $6,300,000 is irrevocable through 30 days after the entry of the sale order approving the sale, unless extended by motion of the bankruptcy court.

Did I read that correctly?

A You did.

Q And was that your declaration at the conclusion of the auction?

A Yes.

Q And is that your testimony today?

A It is.

Q That you remain --

THE COURT: So, for my own benefit, I take it that the word "my" is referring to CM Capital Group, LLC. Is that fair?

THE WITNESS: Yes, sir, it is.

THE COURT: All right. And is CM Capital Group, LLC prepared to, today, for example, if I take a recess, prepared to interlineate and sign off on contracts for sale with the winning bid prices imposed into the actual contracts of sale?

THE WITNESS: Yes.

THE COURT: Okay.

MR. HOLMES: Thank you, Your Honor.

BY MR. HOLMES:

Q Okay, Mr. Ruff. Back to the day of the auction.

But to announce the agreement, the Trustee and CM Capital Group have executed contracts of sale that are the same as the agreements that are exhibits before the Court at 26, 27, -- no, make that 27, 28, and 29, with merely a change to the purchase price to reflect the winning bid at auction, and an interlineated statement at the end of the contract that reads as follows: No executory contracts or unexpired leases are being assumed or assigned by this contract. Signed by both the Trustee and CM Capital.

THE COURT: Okay.

MR. HOLMES: Unless there's an objection, I'd like to offer these into evidence as Trustee's Exhibit 46, 47, and 48.

THE COURT: Any objection?

MR. OLSON: No objection if I can wind up with a copy of them.

THE COURT: We can make a copy. That's not a problem.

All right. Then, without objection, Trustee's Exhibits 46, 47, and 48 will be admitted.

MR. HOLMES: Thank you.

(Trustee's Exhibits 46, 47, and 48 are admitted.)

MR. HOLMES: May I approach the witness?

THE COURT: You may.

REDIRECT EXAMINATION, RESUMED

BY MR. HOLMES:
Q Mr. Ruff, I've handed you three documents marked as Trustee's Exhibits 46, 47, and 48. Do you have those?
A Yes, sir.
Q Are those the contracts for sale of each of the three properties that you executed with the Trustee just in a recess before this testimony?
A They are.
Q And the interlineations on the agreement, what does the interlineation there at the end of the agreement say?
A 8.19. It says: No executory contracts or unexpired leases are being assumed or assigned by this contract.
Q And do you understand that to mean that no agreements will be transferred to CM Capital as part of the sale if they're an executory contract or unexpired lease?
A That is correct.
Q Okay. And is that provision the same for each of the three contracts?
A It is.
Q Could you also please look at the sale price on each of the three contracts --
A Yes.
Q -- and affirm that it is the correct amount of the winning bid? For example, Exhibit 46, what is -- for CM Resort, LLC's property, what does it reflect as the purchase

Case 18-43168-elm11 Doc 1243 Filed 08/07/25 Entered 08/07/25 18:29:26 Desc
Main Document Page 83 of 129



price?
A $6.3 million.
Q Okay. And Exhibit 47, I believe that's for the Specfac property. Is that correct?
A Yes, sir.
Q What does it reflect as the purchase price?
A $500,001.
Q Okay. And Exhibit 48, is that for the Sundance property?
A Yes.
Q What does it reflect as the purchase price?
A $500,001.
Q And are you requesting the Court approve those contracts as the operative agreements?
A I am.
Q Okay. And beyond those contracts, to clarify what we talked about before the break, is it CM Capital's request that the Trustee reject any executory contracts and unexpired leases that are subject to rejection as part of the sales?
A It is.
MR. HOLMES: No further questions, Your Honor.
THE COURT: Okay. And actually, let me, before you go anywhere, because I just want to make sure that I understand.
So the concept is that any of the executory contracts or unexpired leases that are affiliated with the three selling

was a deadline established for any bids to be presented which was June 29, 2023. And at the hearing that we had in mid-July, the counsel for the Trustee announced to the Court that there had been three qualified bidders show up and present bids with respect to the properties at issue, which, just for simplicity's sake, I'm just going to refer to those properties going forward as the "CM Resort Property," the "Specfac Group Property," and the "Sundance Lodge Property." In relation to the CM Resort Property, obviously, we already had Integrated Ventures as the approved stalking horse bidder, but it was also disclosed that CM Capital Group, LLC had presented a qualified bid in relation to that property.

In relation to the Specfac Group and Sundance Lodge Properties, it was disclosed that two qualified bidders had shown up in relation to those properties, I believe, and -- no, that's right -- and those qualified bidders were Lazarus Partners and CM Capital Group.

So, thereafter, the auction with respect to the sale of those properties, all three properties -- CM Resort, Specfac Group, and Sundance Lodge -- was conducted at the Trustee's counsel's offices, the Cavazos Hendricks offices, on July 20, 2023. And at the conclusion of that process, the Trustee filed a notice of auction results at Docket No. 987, which I believe was also introduced into evidence as Trustee's Exhibit 3.

As noticed pursuant to the Trustee's notice, the Trustee identified CM Capital Group, LLC as the winning bidder for all three properties. With respect to CM Resort Property, with a bid of $6.3 million. With respect to the Specfac Group Property, with a bid of $500,001. And with respect to the Sundance Lodge Property, with a bid of $500,001.

The notice also disclosed that the Trustee had selected backup bidders for the properties, and that the winning backup bidder for the CM Resort Property was Integrated Ventures, with a bid amount of $6.2 million. And with respect to the Specfac Group Property, Lazarus Partners, LLC, with a bid of $400,001. And with respect to the Sundance Lodge Property, Lazarus Partners, LLC, with a bid of $400,001.

So, with that determination having been made by the Trustee, today the Trustee seeks approval of those winning bids and backup bids, respectively, with respect to the properties, and in conjunction therewith the authorization to reject all identified associated executory contracts and unexpired leases related to those property interests.

For purposes of considering those matters, the Court is obviously governed by 11 U.S.C. Section 363, and in addition to that, 365 with respect to the executory contract and unexpired lease issues.

With respect to -- and I should say, 363 really applies

I do find that there's been sufficient evidence presented of the ability to close by CM Capital Group, and that for all of the foregoing reasons, I find that the Trustee has exercised sufficient and sound business judgment in electing to move forward with CM Capital Group, LLC as the winning bidder for all three properties:  the CM Resort Property, the Specfac Property, and the Sundance Lodge Property.

And for the same reasons I will overrule all of the objections lodged by Suzann Ruff.

For Section 363(f) purposes, the sales being free and clear, I find that the transactions proposed satisfy Section 363(f)(3) in the sense that the consideration proposed is sufficient to cover all liens and interests in the property that would have to be paid as part of the closing of the transactions.  And there's obviously been no objection to the free and clear nature of the transactions.

I'm going to divert here momentarily to Section 365 issues.  For Section 365(a) issues, again, as indicated, it's also a sound business judgment standard, and I find that there was sufficient notice to the counterparties with respect to the prospect of possible rejections of the associated leases and contracts, and that in an effort to maximize value to the estates through the bidding process, and understanding that the bidders were clearly provided with the expectation of having an ability to identify those leases

and contracts that constitute 365 contracts and leases for the possibility of rejection, that the Trustee has exercised sound business judgment in electing to move forward with the rejection of the executory contracts and unexpired leases that were identified on the order at Docket No. 985 in connection with consummating the proposed transactions.

Turning to Section 363(m) purposes. In considering whether or not a proposed purchaser should be entitled to protections under Section 363(m), the Court is concerned with questions of whether or not the negotiations and bidding processes took place on an arm's length basis and whether there is any indication of collusive conduct in the bidding process.

I find that, clearly, the bidding process and the auction process itself was designed to ensure that there was going to be an arm's length bidding process. In fact, this is exactly why I wanted to make sure that we were having a marketing process, so that we could ensure to maximize the greatest and highest value for the properties, which in fact occurred. And given that the Trustee and his counsel was involved in managing and running the auction process, even more of a reason to find that the bidding processes were conducted on an arm's length basis.

I also find that the testimony was clear and uncontradicted that there was no collusive conduct in

connection with the bidding process. Among other things, Mr. Ruff testified that he had no communications with any other bidder heading into the process whatsoever, and therefore each of the bidders bid how they saw fit.

I should also note, kind of oddly, there was sort of a suggestion of -- I just found it very odd. There had obviously been, as a lot of effort was spent talking about it in connection with the -- I think it was the bid procedures hearing, this arrangement that Mr. Baker had made with Ms. Ruff, that in the event that her appeal is successful, that Ms. Ruff would have the ability to acquire the properties back from Mr. Baker. And there was, again, a lot of angst expressed from CM Capital Group with respect to that, because of the belief that somehow that laid an unfair playing field, if you will, on the bidding process.

Again, there was, I think, some reference sort of to that concept today, and sort of the suggestion that CM Capital Group had some sort of unfair advantage, which is very odd to me because Suzanne Ruff herself refused to agree to provide that same benefit to CM Capital Group and said she would never do it.

So any suggestion of unfairness by virtue of Ms. Ruff refusing to do something is really, frankly, odd at best, and disingenuous at worst.

So I just make reference to that because I just want it

to be clear that it was Ms. Ruff herself who said that she was not interested and would never enter into any such arrangement with CM Capital Group.

So, again, with all that said, and to wrap things up, the sales to CM Capital Group as the winning bidder of the CM Resort Property at $6.3 million, the Specfac Property at $500,001, the Sundance Lodge Property at $500,001, and along with it the authorization for the Trustee to reject associated executory contracts and unexpired leases, is approved. That the sale of the CM Resort Property to Integrated Ventures as the backup bidder, should the CM Capital Group fail to close on the CM Resort Property, is approved at the backup bidder price of $6.2 million. And, again, along with the authorization for the Trustee to reject the associated executory contracts and/or unexpired leases. I think it's just one unexpired lease. And that the sale of the Specfac and Sundance Lodge Properties to Lazarus Partners as the backup bidder, should CM Capital Group fail to close on those transactions, is similarly approved, again, with the authorization for the Trustee to reject any associated executory contracts or unexpired leases in conjunction therewith. And that each of CM Capital Group, Integrated Ventures, and Lazarus Partners are entitled to the good faith purchaser protections of Section 363(m) in connection with those transactions.

Case 18-43168-elm11 Doc 1332 Filed 08/26/25 Entered 08/26/25 18:19:28 Desc Main Document Page 128 of 129



a brief recess before we take up those matters. So the Court will be in recess.

THE CLERK: All rise.

(Proceedings concluded at 1:56 p.m.)

--oOo--

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

**/s/ Kathy Rehling** **08/26/2025**

__________________________________ ________________

Kathy Rehling, CETD-444 Date
Certified Electronic Court Transcriber

# REPLY APP 5

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In Re: | ) | **Case No. 18-43168-elm-11** |
| | ) | Jointly Administered |
| CM RESORT, LLC, et al., | ) | Fort Worth, Texas |
| | ) | May 8, 2025 |
| Debtors. | ) | 10:30 a.m. |
| | ) | MOTION TO ENFORCE BY CM CAPITAL GROUP, LLC [1182] |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE EDWARD L. MORRIS,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

| | |
|---|---|
| For CM Capital Group, LLC, Movant: | Joyce W. Lindauer<br>JOYCE W. LINDAUER ATTORNEY, PLLC<br>1412 Main Street, Suite 500<br>Dallas, TX 75202<br>(972) 503-4033 |
| For Suzann Ruff: | Randal Gilbert Mathis<br>Mark Donheiser<br>MATHIS & DONHEISER, P.C.<br>1412 Main Street, Suite 2600<br>Dallas, TX 75202<br>(214) 661-8915 |
| For Suzann Ruff: | Dennis Oliver Olson<br>DENNIS OLSON, ATTORNEY AT LAW<br>1412 Main Street, Suite 2600<br>Dallas, TX 75202<br>(214) 460-7179 |
| For John Dee Spicer, Trustee:<br>(WebEx) | Steven Thomas Holmes<br>CAVAZOS HENDRICKS POIROT, P.C.<br>900 Jackson Street, Suite 570<br>Founders Square<br>Dallas, TX 75202<br>(214) 573-7305 |

APPEARANCES, cont'd.:

For John Dee Spicer, Trustee: (WebEx)

John Dee Spicer
CAVAZOS HENDRICKS POIROT, P.C.
Suite 570, Founders Square
900 Jackson Street
Dallas, TX 75202-4425
(214) 573-7330

Recorded by:

Shelley Warren
UNITED STATES BANKRUPTCY COURT
501 W. 10th Street
Fort Worth, TX 76102
(817) 333-6005

Transcribed by:

Kathy Rehling
311 Paradise Cove
Shady Shores, TX 76208
(972) 786-3063

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

FORT WORTH, TEXAS - MAY 8, 2025 - 10:34 A.M.

THE CLERK: All rise.

THE COURT: Good morning. Please be seated. All right. We're on the May 8th, 2025 10:30 a.m. docket. We have the CM Resort, LLC and affiliated debtors cases, jointly administered under Case 18-43168. Let me go ahead and start by taking appearances of counsel, and we'll start with counsel in the courtroom. Ms. Lindauer?

MS. LINDAUER: Thank you, Your Honor. Your Honor, Joyce Lindauer here on behalf of CM Capital Group, LLC.

THE COURT: All right. Mr. Mathis?

MR. MATHIS: Good morning, Your Honor. Randy Mathis, Mark Donheiser, and Dennis Olson on behalf of Suzy Ruff.

THE COURT: All right. Good morning to all of you.

All right. On WebEx, do we have anybody wishing to make an appearance today?

MR. HOLMES: Good morning, Your Honor. Steven Holmes on behalf of the Chapter 11 Trustee, John Dee Spicer. Mr. Spicer is on the WebEx as well.

THE COURT: Okay. Good morning to both of you.

Any other counsel wishing to make an appearance?

All right. Ms. Lindauer?

OPENING STATEMENT ON BEHALF OF CM CAPITAL GROUP, LLC

MS. LINDAUER: Thank you, Your Honor. Good morning, Your Honor. Joyce Lindauer again for CM Capital Group, LLC.

Your Honor, the main reason that we're here this morning involves a document that was filed by Mr. Mathis' firm called Notice of Lis Pendens. It was filed on February 7th, 2025, so just within the last couple months. We believe that that notice of lis pendens should be expunged by this Court, and that this Court has appropriate jurisdiction to expunge that lis pendens.

Your Honor, just briefly to go back a little bit, the Court ordered the sale of various assets owned by the Debtors in these pending Chapter 11 cases. The sale orders are very important, obviously, to the determination of the issues before the Court this morning. The sale orders specifically provided to my client good-faith purchaser status. There was no stay pending appeal of the sale orders. The sale orders have now become final and are no longer subject to any appeal. The appeal of the sale orders was dismissed. CM closed on the purchase, as required. The Court specifically allowed the Trustee to sell the property free and clear of -- and I'll get into this in more detail -- the adversary litigation and the appeal. And why we take the position is the Court specifically took all claims, including Suzann's, and attached them to the sale proceeds. And Your Honor, we believe that the only relief that Suzann Ruff has before this Court -- or for that matter, any court -- is a right to request monies perhaps based on her proof of claim that she filed in this

I do think that the sale orders provided for Ms. Ruff to retain whatever rights she had, and I believe the order is clear that she retains them against the proceeds of sale. That's -- that was the concept of the sale order.

Your Honor, we don't believe that she retained any rights or interests in the real estate itself. If she does recover in the Fifth Circuit, then she'll be back here with her proofs of claims, I'm sure, which are for dollar amounts, and seeking to recover on her proofs of claim.

So, Your Honor, I just think that the notice of lis pendens is inappropriate and should not have been filed. I think it's inaccurate, and I do think it should be expunged.

Thank you.

THE COURT: All right. Thank you.

Just give me a second.

(Pause.)

THE COURT: All right. I know this is important to you all, so I just wanted to make sure and get this done for you all today.

Again, before the Court for determination is the Motion to Enforce 363(m) Sale Orders and to Dissolve Lis Pendens filed by CM Capital Group, LLC at Docket No. 1182.

We have Suzann Ruff's Response and Opposition filed at Docket No. 1183, and then we have CM Capital Group's Reply filed at Docket No. 1193.

Obviously, all of this relates to three different sale orders entered by the Court back in August 2023 or thereabouts. Those sale orders were at Docket Nos. 1006, 1007, and 1008, which are all included within Movant's Exhibit 2 that's been admitted into evidence.

So with that in mind, obviously, with respect to jurisdiction, the Court has subject matter jurisdiction to consider and determine the request for relief pursuant to 28 U.S.C. Sections 1334 and 157 and Miscellaneous Order No. 33 of the District Court for the Northern District of Texas. And it's a core proceeding under 28 U.S.C. Section 157(b)(2) inasmuch as, obviously, anytime that there's a question with respect to the interpretation of the Court's orders, that's inherently a core proceeding.

Obviously, what has brought us here today, there's a long history associated with all of this, a longstanding dispute with respect to property interests. It resulted eventually in some litigation under Adversary Proceeding 18-4147 that ended up in a judgment that was then appealed to the District Court that resulted in Case No. 4:22-cv-0135-P, again, with the District Court for the Northern District of Texas in front of Judge Pittman, which was affirmed and timely appealed to the United States Fifth Circuit Court of Appeals and is currently pending with the Fifth Circuit.

As I've alluded to in connection with sustaining certain

Okay?

All right. Well, it was good to see all of you. That will conclude today's hearing. We have hearings that will pick back up at 1:30, but the Court will be in recess until then.

MR. MATHIS: Thank you.

THE CLERK: All rise.

(Proceedings concluded at 11:50 a.m.)

--oOo--

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

**/s/ Kathy Rehling** **06/09/2025**

______________________________________ ________________

Kathy Rehling, CETD-444 Date
Certified Electronic Court Transcriber